PARFI HOLDING AB, Gunnar Gillberg, Plenteous Corp. and Grandsen, Ltd., Plaintiffs,

v.

MIRROR IMAGE INTERNET, INC., Xcelera.com, Inc., Alexander M. Vik, Gustav Vik and Hans Magnus Fajerson, Defendants.

C.A. No. 18507–VCS.

Court of Chancery of Delaware.

Submitted: June 4, 2008.
Decided: Sept. 4, 2008.

Thomas P. McGonigle, Esquire, Todd C. Schiltz, Esquire, Wolf Block, LLP, Wilmington, DE; Michael Paris, Esquire, William C. Nystrom, Esquire, Nystrom Beckman & Paris, LLP, Boston, MA, for Plaintiffs.

Jesse Finkelstein, Esquire, Brock Czeschin, Esquire, Richards Layton & Finger, Wilmington, DE; Peter J. MacDonald, Esquire, Wilmer Cutler Pickering Hale and Dorr, LLP, New York City; Robin L. Alperstein, Esquire, Becker, Glynn, Melamed & Muffly, LLP, New York City, for Defendants Xcelera Inc., Alexander M. Vik, Gustav Vik and Hans Magnus Fajerson.

## OPINION

STRINE, Vice Chancellor.

### I. *Introduction*

This opinion addresses several important issues in this case.

The first and most troubling is what consequences should attach when plaintiffs in a derivative action mislead the court about the reasons for their failure to take certain actions relevant to the case. The record reveals that a plaintiff who wished to have this court lift a stay that was in place pending the completion of a closely related arbitration made false representations of fact to this court about why it had failed to prosecute the arbitration on the schedule it had previously submitted to the court, claiming that it was "impossible" for the plaintiff to fund the arbitration because of a recent adverse financial development and suggesting that the plaintiff had not been aware of the size of the required arbitration filing fee. As discovery has revealed, those factual claims were false. The plaintiff had known about the size of the required filing fee for a long time and had sufficient funds to initiate and prosecute the arbitration. But, desiring to have this court reverse its prior decision to stay this case until the arbitration was completed, the plaintiff attempted to have the court believe that the plaintiff was too

impoverished to prosecute the arbitration and allow this case to move forward first. In essence, the plaintiff sought to have a motion for reargument granted, but not by way of proper argument, but instead on the basis of a misleading recitation of the facts. In this opinion, I conclude that an order of dismissal is the only fitting remedy for this misconduct. When a party knowingly misleads a court of equity in order to secure an unfair tactical advantage, it should forfeit its right to equity's aid. Otherwise, sharp practice will be rewarded, and the tradition of civility and candor that has characterized litigation in this court will be threatened.

Second, I conclude that, in any event, the plaintiffs do not have derivative standing. One of the plaintiffs did not own stock at the time of two of the transactions it challenges and thus lacks standing as to those claims. And, as to its other claims, that plaintiff lacks standing because it sold off any economic interest in the company on whose behalf it is putatively suing during the course of this litigation, leaving itself an empty holder without any economic interest in the corporation. Given that reality, the public policy purpose behind the continuous ownership rule requires a finding that this plaintiff lacks standing. There are well-founded concerns about the agency costs of derivative suits in general, given the small stakes that many plaintiffs have. To permit a party to act as a derivative plaintiff when it has emptied itself of any economic interest in the corporation would invite abuse of the representative litigation mechanism, undermining its credibility and its utility in enforcing high standards of fiduciary conduct.

As to the other plaintiff, it has not been a stockholder since late 2002, when it was cashed out in a reverse stock split. The year 2008 is already more than two-thirds gone, and the plaintiff has never taken any steps to challenge the propriety of the reverse split and is thus time-barred from doing so. Since that plaintiff is no longer a stockholder, it lacks standing to serve as a derivative plaintiff.

In the remainder of this decision, I find that the plaintiffs are not adequate derivative plaintiffs for the same reason that I granted dismissal, which is that they knowingly misled the court about a material matter and are not fit to serve in a representative capacity. I also quantify the amount the plaintiffs owe to the defendants for their prior improper refusal to respond to discovery.

## II. *The Parties*

This case is a period piece of sorts that centers on a small Internet company, Mirror Image Internet, Inc. The plaintiffs were stockholders in Mirror Image and feel aggrieved by another investor, defendant Xcelera.com, Inc., who the plaintiffs believe shunted them aside and usurped for itself the chance all Mirror Image stockholders deserved to ride the soon-to-burst Internet bubble of 1999.

### A. *The Plaintiffs*

After extensive discovery during the last two years, much more is known about the plaintiffs in this case than was known when the court addressed this case on previous occasions.[1] The plaintiffs have functioned as a unit during this litigation for a reason I will soon detail. The origi-

---

1. This case, which is very old by the standards of this court, has already generated four reported judicial decisions: *Parfi Holding AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211 (Del.Ch.2001) ("*Parfi I*"), rev'd, 817 A.2d 149 (Del.2002) ("*Parfi II*"); *Parfi Holding AB v. Mirror Image Internet, Inc.*, 842 A.2d 1245 (Del.Ch.2004) ("*Parfi III*" or the "Stay Order"), aff'd in part, rev'd in part, 926 A.2d 1071 (Del.2007) ("*Parfi IV*").

nal plaintiffs in the case were Plenteous Corp.; Parfi Holding, AB; Gunnar Gillberg; and Grandsen, Ltd. At their request, Gillberg and Grandsen were dismissed as plaintiffs in 2005.

Plaintiff Plenteous Corp. is a Panamanian corporation and was a minority shareholder in Mirror Image at the time of the transactions at issue in this case. Since November 2002, Plenteous has not been a stockholder of Mirror Image, having been cashed out in a reverse stock split. The owner of Plenteous is a company called Meillor Establishment, which in turn is owned by the Florentis Foundation, a foundation set up to be used as a personal family estate planning vehicle for Atle Lygren ("Lygren"). Lygren dominates and controls Plenteous, and uses its funds as he wishes to meet his personal needs and desires.[2]

Plaintiff Parfi Holding, AB is a Swedish corporation and a minority shareholder in Mirror Image. The plaintiffs told the court in their complaint that Parfi was the "successor-in-interest" to Mirror Image Internet AB ("Mirror AB"), the Swedish former parent corporation of Mirror Image. But that turns out not to be literally true. Mirror AB was founded in 1996 by Sverker Lindbo ("Lindbo"), who has been one of its directors ever since.[3] Mirror Image was incorporated in Delaware as a subsidiary of Mirror AB in May 1997. In May 1999, Mirror AB changed its name to Drax Holding AB. On October 14, 1999,

Drax sold its "business" and assets to Parfi, but that transaction did not cover Drax's shares in Mirror Image.[4] Confusingly, however, the transaction appears to have contemplated that Parfi would acquire whatever litigation rights Drax had relating to Mirror Image.

In a later transaction, Parfi—whose stockholders consisted of many but not all the previous stockholders of Mirror AB, and not in the same ownership percentages—acquired the shares of Mirror Image that Drax owned for the nominal consideration of one Swedish kroner, or about twenty U.S. cents. Indeed, it appears that Parfi raised capital by convincing previous stockholders in Mirror AB and new investors that they could reap large benefits if litigation relating to Mirror Image was successful.

The various plaintiffs bound themselves together by a Joint Prosecution Agreement (the "JPA") on October 28, 1999.[5] The JPA, whose signatories include various shareholders of Mirror Image, was created for the purpose of conducting litigation proceedings in Delaware and in Sweden. Through the JPA, the plaintiffs allocated responsibility for litigation costs to a "Consortium" and also rights of recovery, including, rather oddly, rights of recovery as to derivative claims that might be asserted on behalf of Mirror Image. It also served a similar function for the ef-

2. *See, e.g.,* 09/12/05 Tr. at 46, 55:
 Lygren: I [act on behalf of Plenteous] on the basis of a power of attorney that has been issued to me ... I have control to make Plenteous take the decisions that are within the scope of my authority. Plus, obviously since I was the one who formed the estate ... I can influence what the foundation eventually decides to do.... Q. ... you have directed not only the expenditures but also the investment strategy of

 Plenteous over the last 10 years? A. That's correct.
 *See also* Lygren Dep. at 22–24; Gillberg Dep. at 86 ("Yeah, Atle is the person behind Plenteous.").

3. *See* Lindbo Dep. at 6–7.

4. *See* Macdonald Aff. Ex. 5.

5. *See* Macdonald Aff. Ex. 6.

forts of the Consortium members to obtain relief in arbitration in Sweden.[6]

Oddly, the plaintiffs appear to have sought out investors who were not Mirror Image stockholders and asked them to buy into the Consortium, so as to profit from litigations and arbitrations related to Mirror Image.

### B. *The Defendants*

Nominal defendant Mirror Image is a Delaware corporation involved in designing technology to speed information retrieval and transmission across the Internet. As noted above, Mirror Image was formed in 1997 as a Delaware subsidiary of Swedish-based Mirror AB.

Defendant Xcelera is a Cayman Islands holding company. Xcelera has been Mirror Image's majority shareholder since 1999, and it continues to control Mirror Image.

Defendants Alexander M. Vik, his brother Gustav M. Vik, and Hans Magnus Fajerson have been, at all relevant times, members of the boards of both Xcelera and Mirror Image. Additionally, the majority shareholder of Xcelera is an entity called Vik Brothers International, which is controlled by Alexander and Gustav Vik's father.

### III. *Factual Background*

The factual background of this case has been described in depth in the opinions previously issued by this court and the Delaware Supreme Court.[7] I will therefore give a truncated version.

The basic story goes like this. Mirror AB gave birth to Mirror Image but did not have sufficient capital to nurture it to the status of a successful, thriving public company. Although Internet companies were hot in the late 1990s and Mirror Image had an interesting product concept,[8] "Mirror Image required frequent infusions of capital to stay operational. Mirror AB could not, on its own, meet the financing needs of its subsidiary. By 1999, Mirror AB had to seek outside investors who could provide enough funds so that Mirror Image could meet its short-term obligations and stave off bankruptcy."[9]

Although Mirror AB's leader, Sverker Lindbo, had incorporated Mirror Image in Delaware in 1997 with a goal of going public again, he looked to his homeland, Sweden, for new equity investors when Mirror AB could no longer shoulder the load. That is when Xcelera and Plenteous came on the scene. In March 1999, Mirror Image, Xcelera, and Plenteous entered into an agreement (the "Underwriting Agreement").

The Underwriting Agreement provided that Mirror Image would receive a total of $2 million in capital and that Xcelera and Plenteous would purchase a certain number of shares of Mirror Image stock at a predetermined price.[10] Specifically, the Underwriting Agreement provided that Xcelera and Plenteous would subscribe to

---

**6.** Pursuant to the JPA, "[a]ny judgment or settlement" obtained in the Swedish or Delaware action would be allocated among the parties to the JPA by the allocation mechanism of the JPA. JPA Section 9. *See also* Lindbo Dep. at 121–128.

**7.** *See supra* note 1.

**8.** Since its inception, Mirror Image has been engaged in the development of technology designed to enhance the speed of information retrieval and transmission across the Internet. *See Am.* Compl. at 7.

**9.** *Parfi II,* 817 A.2d at 151.

**10.** The rather confusing terms of the Underwriting Agreement are detailed more fully in *Parfi I,* 794 A.2d at 1217–18.

3,876 shares of Mirror Image stock at $516 per share, the subscription to be allocated between Xcelera and Plenteous by a 7–to–1 ratio. The Underwriting Agreement also allowed certain individuals to subscribe to 875 shares of Mirror Image stock, shares which would be issued from the subscription allocations to Xcelera and Plenteous and apportioned according to their relative positions. The subscription was divided into three parts. In the first tranche, Mirror Image would receive $1 million in capital from Xcelera ($875,000) and Plenteous ($125,000), in exchange for providing Xcelera and Plenteous 1,696 and 242 shares respectively. This first tranche gave Xcelera nearly 50% of the vote. In the second tranche, the individuals mentioned above could subscribe. In the third tranche, the balance of the total subscription would be issued to Xcelera and Plenteous for payment of the remainder of the $2 million. Pursuant to the Underwriting Agreement, Xcelera would have owned over 60% of the shares once all the contemplated shares were issued. The Underwriting Agreement also gave Xcelera, Plenteous, and Mirror AB the right to appoint the new Mirror Image board, with Xcelera and Plenteous having most of the appointees. But, the plaintiffs claim that Xcelera, which placed four of its representatives, defendants A. Vik, G. Vik, and Fajerson, as well as Tryggwe Karlsten, on the five-person board, soon seized sole dominion for itself over the company's direction. Importantly, as things turned out, the Underwriting Agreement provided that any dispute, controversy, or claim "arising out of or in connection with this Agreement, or the breach, termination or invalidity thereof, shall be settled by arbitration" in Sweden.[11]

The relationship among the parties deteriorated soon after the Underwriting Agreement closed. According to the plaintiffs, Xcelera immediately began to use its control of Mirror Image for improper purposes. Specifically, the plaintiffs further allege that the third tranche contemplated in the Underwriting Agreement never took place, but that instead, once Xcelera had control of Mirror Image, it initiated a series of transactions (the "Challenged Transactions") that it claims were designed to benefit Mirror Image, but which the plaintiffs contend were designed as a scheme to dilute their minority interest unfairly and to secure for Xcelera all of Mirror Image's upside.[12]

This process of value extraction was supposedly initiated by the "April and July 1999 Subscriptions." These were stock offerings that were supposedly done without proper board authorization and on very short notice at an unfairly low price. According to the plaintiffs, the now Xcelera-dominated Mirror Image board required that Mirror Image stockholders wishing to subscribe to these offerings do so on unreasonably short notice with the intent of ensuring that all of the new shares issued would go to Xcelera at a bargain price.[13] When these Subscriptions closed, Xcelera had purchased the full slugs of shares offered and increased its ownership interest in Mirror Image to 91.8%.

The next step in the scheme supposedly was for Xcelera—which was a public company trading on the American Stock Ex-

---

11. *Parfi I*, 794 A.2d at 1217 (quoting the Underwriting Agreement § 20.2); *Parfi II*, 817 A.2d at 151 (same).

12. *See Parfi I*, 794 A.2d at 1218; *Parfi II*, 817 A.2d at 152.

13. The plaintiffs also alleged that Xcelera did not honor promises to keep Lindbo on as CEO by engaging in improper behavior that led to his resignation and by failing to seat a director named by Plenteous.

change—to exploit its control of Mirror Image to pump up Xcelera's own value and stock price. Thus, the plaintiffs allege that in the November 1999 preferred stock offering ("the Preferred Stock Offering"), the Mirror Image board authorized a private placement of convertible preferred stock in such a way that, once again, only Xcelera could invest. Like the previous common stock subscriptions, the Preferred Stock Offering was supposedly priced to advantage Xcelera and injure Mirror Image. Even worse, the Preferred Stock Offering was designed to give Xcelera, but not other Mirror Image stockholders, the chance to capitalize on a strategic alliance between Mirror Image and Hewlett–Packard. The strategic alliance involved a $32 million investment in Mirror Image by HP. Xcelera purchased the new Mirror Image preferred stock before the public was told about the HP investment. After Mirror Image announced the HP investment on December 21, 1999, Xcelera's stock price shot up almost 240 percent, from $67 per share to $160 per share.

Finally, the plaintiffs complained that Xcelera then used its ownership of virtually all of the equity of Mirror Image to usurp a corporate opportunity belonging to Mirror Image itself. In March 2000, Exodus Communications, Inc. agreed to purchase over 32 million shares of Mirror Image for $75 million in cash and over 3 million shares of Exodus stock (the "Exodus Transaction"). Exodus allegedly paid 75% of the combined value of cash and stock directly to Xcelera in exchange for Mirror Image shares owned by Xcelera, leaving Mirror Image itself with only 25% of the gains. The plaintiffs claim that in structuring the deal this way, Xcelera usurped a corporate opportunity belonging to Mirror Image.

The plaintiffs were not pleased by the Challenged Transactions, as is made clear by the fact that they executed the JPA in October 1999.

They struck first in Sweden, where Drax and Plenteous brought claims against Xcelera in Sweden before a three-person arbitration panel (the "Swedish Arbitration"). Drax, however, appears to have sold any right to its share of the recovery to Parfi. In November 2000, the plaintiffs then filed this suit in the Court of Chancery alleging numerous claims based on the Challenged Transactions. The factual allegations in the Delaware case were taken largely from the statement of claim in the Swedish Arbitration.[14]

From the get-go, the plaintiffs realized that they faced a substantial question about whether they could proceed in the Court of Chancery given the breadth of the arbitration clause in the Underwriting Agreement and, even more important, their own interpretation of that Agreement. In the Swedish Arbitration, the plaintiffs alleged that an enforceable "assumption" of the parties to the Underwriting Agreement was that Xcelera would not use its control of Mirror Image to unfairly dilute Mirror Image's minority stockholders.[15] The plaintiffs also argued that Xcelera had agreed not to dilute the percentage ownership of the minority stockholders while Xcelera and the minority looked for a permanent funding source for Mirror Image. The plaintiffs sought to hold Xcelera liable in the Swedish Arbitration for the alleged breach of these assumptions. Likewise, the plaintiffs sought a finding that Xcelera was liable for the Preferred

**14.** For a discussion of all claims asserted by the plaintiffs in their original complaint, see *Parfi I*, 794 A.2d at 1221–22, 1228–39.

**15.** *Parfi I* detailed the arguments made by the plaintiffs to the Swedish Arbitration Panel. 794 A.2d at 1223–25.

Stock Offering and the Exodus Transaction, arguing that the latter transaction was structured to divert an opportunity from Mirror Image to Xcelera. In essence, the plaintiffs argued that the Underwriting Agreement incorporated, as a contractual commitment, the protections afforded by Delaware fiduciary duty law, and sought a liability determination based on that argument.

The discovery record has now revealed that the plaintiffs' U.S. counsel was concerned from the outset that the plaintiffs might be ordered by this court to arbitrate all of its claims, since the claims in the Swedish Arbitration involved not only the same conduct as was involved in the Delaware claims, they also involved the same theory of unfair dilution.[16] Moreover, it also appears that, from the outset, the Swedish Arbitration was intended in some measure as a way to clear the way for litigation in Delaware, with the belief that a determination that the Underwriting Agreement was induced by fraud would relieve the plaintiffs of the obligation to arbitrate their claims.[17] Perhaps for that reason, the plaintiffs walked a two pound test line in the Swedish Arbitration.

While telling the Arbitration Panel that Xcelera had contractually promised them that it would not unfairly dilute them, the plaintiffs also asked the Arbitration Panel to avoid making any determination whether Xcelera had breached fiduciary duties under Delaware law. By this means, the plaintiffs could potentially get a positive ruling on the unfair dilution issue, while leaving open the chance to try the same theory over again in Delaware under the fiduciary duty rubric.

It therefore was not a surprise to the plaintiffs when the defendants promptly moved to dismiss or stay the Delaware action pending completion of the Swedish Arbitration. Before that motion was decided, the Swedish Arbitration Panel issued its ruling on the claims before it. In the main, the Arbitration Panel found for Xcelera and against Plenteous and Parfi. Thus, the Panel rejected the idea that the parties to the Underwriting Agreement had contracted on the assumption that Xcelera would not cause Mirror Image to raise capital in the near future in a way that would dilute the minority stockholders further. The Panel also held against Parfi and Plenteous as to their arguments that Xcelera denied their representatives, Lindbo and Lygren respectively, certain managerial roles at Mirror Image.

Importantly, the Panel also refused to opine on whether there had been any "unfair dilution," stating:

> The Claimants have explained that by dilution they mean only "unfair" dilution, not any such dilution as will inevitably occur by an issue of shares in which the minority shareholders do not participate. In the understanding of the Tribunal the distinction between fair and unfair dilution can absent express agreement be drawn only with reference to applicable company law. It can be said that any agreement resulting in some lasting relation between the parties thereto is premised on the assumption that the other party or parties will in the future behave within the limits of the law. Such assumption does not, however, trigger legal remedies different from those which follow from the application of the relevant law. In this case it is

---

**16.** See, e.g., Macdonald Aff. Exs. 10, 13, 14; Nilsson Dep. at 19–20; Defs.' Supp. Br. at 4 (citing evidence to this effect).

**17.** See, e.g., Macdonald Aff. Ex. 64; Nilsson Dep. at 13–20; Lygren Dep. at 34–36; Defs.' Supp. Br. at 4–7 (citing evidence to this effect).

accordingly for the Courts of the State of Delaware to determine whether there was "unfair" dilution and what the legal consequences may be. The Tribunal cannot find that any particular assumptions regarding dilution relevant to this arbitration have been proved.[18]

In one important respect, however, the Arbitration Panel ruled against Xcelera. Plenteous succeeded on a claim that it had made a side arrangement with Xcelera whereby Xcelera would seek Plenteous's consent before taking any "corporate actions."[19] The Arbitration Panel determined that the April and July Subscriptions were such actions taken without Plenteous's consent, and held that Plenteous was entitled to damages for any resulting dilution in their interest in Mirror Image. But the Panel rejected the arguments that the HP or Exodus Transactions implicated Plenteous's consent rights and found for Xcelera on those points.

Eventually, I dismissed this action, finding that the plaintiffs' claims in this case fell within the reach of the broad arbitration clause within the Underwriting Agreement.[20] On appeal, the Supreme Court reversed this court's decision in 2002, allowing the plaintiffs to bring their breach of fiduciary duty claims in Delaware despite the close identity between those claims and the contractual "unfair dilution" claims the plaintiffs pressed in the Swedish Arbitration.[21] The case was therefore remanded back to this court in November 2002.

Aside from filing an amended complaint in January 2003 (the "Amended Complaint"), the plaintiffs did little to move this case along other than to substitute in new out-of-state counsel and ask the defendants for an extension of the schedule. In October 2003, the defendants moved in this court to enjoin a resumption of the Swedish Arbitration so that the plaintiffs would not have "two bites at the apple by seeking damages from the Arbitrators arising out of the same transactions that the plaintiffs are attacking in this court."[22]

That motion was precipitated by a September 2003 letter sent by the plaintiffs' Swedish counsel in the Arbitration to Xcelera's Swedish counsel, in which Plenteous claimed payment of compensation for damages in the amount of approximately $569 million for Plenteous's dilution as a result of the Challenged Transactions. Under Swedish law, before Plenteous could recover from Xcelera in damages in arbitration, it had to quantify its damages demand and give Xcelera a chance to satisfy that demand voluntarily. Once Xcelera refused to pay, Plenteous was free to initiate the damages phase of the arbitration against Plenteous (the "Damages Phase") with the Arbitration Institute of the Stockholm Chamber of Commerce (the "SCC"). The cost of doing so included the obligation to make an advance payment that was calculated as a percentage of the damages being asserted in the Damages Phase.

After Xcelera received Plenteous's demand and refused to pay the $569 million damage demand, the defendants moved to enjoin resumption of the Swedish Arbitration. The defendants argued, with a substantial basis, that Plenteous was seeking to recover exactly the same damages that it was seeking in this court. Moreover, the defendants pointed out that the plain-

---

18. *Parfi III*, 842 A.2d at 1252 (quoting the Panel's ruling).

19. *Id.* at 1252–53.

20. *See Parfi I*, 794 A.2d at 1222–28.

21. *See Parfi II*, 817 A.2d at 155–60.

22. *Parfi III*, 842 A.2d at 1247.

tiffs had suggested to this court and the Supreme Court that they would not be seeking damages in Arbitration, but instead only in this court. Not only that, the plaintiffs had previously argued before this court and in the Supreme Court that the Exodus Transaction had no plausible connection to the Underwriting Agreement and claims in the Swedish Arbitration.[23] Thus, the defendants, with some substantial justice, took umbrage at being confronted with a demand that Xcelera pay $569 million in arbitral damages, a number that was calculated in substantial measure by reference to the shares Plenteous would supposedly had been able to sell to Exodus in Xcelera's place had its approval rights been honored. The defendants argued that the plaintiffs had, by their own conduct, made plain what they had previously denied, which is that all their claims were so inextricably bound together that they should be required to prosecute them in a single forum. Because the plaintiffs suggested to the Supreme Court that this court was their chosen forum, the defendants wanted an injunction against further proceedings in Sweden.

After considering the parties' positions on the motion, I did something neither requested. Respecting the Supreme Court's previous decision that the plaintiffs were entitled to split their contractual claims and fiduciary duties claims and press them in different forums, I refused to enjoin the Damages Phase.[24] But, recognizing the substantial overlap between what was sought in the Arbitration and what was sought in this case, and the need to avoid inconsistent judgments and a double recovery, I decided that what was further along ought to be finished as the first order of business.[25]

That is, because the Swedish Arbitration Panel had already decided the merits of the liability claims made in the original Arbitration, it seemed sensible that the first order of business ought to be the completion of that Arbitration. By that means, I would know what the outcome was before hearing the merits of this case, and there was the potential that the damages awarded in the Damages Phase would satisfy Plenteous, or that the immanency of a damages proceeding would lead to a settlement in part or in whole. In so deciding, I expressly rejected as inequitable and inefficient the plaintiffs' fallback concession,[26] which was an offer to not complete the Arbitration until the Chancery case was concluded. Instead, I stayed the Delaware action on February 12, 2004 pending completion of all proceedings in the Swedish Arbitration, including the Damages Phase and the expiration of any right to seek review of the arbitral tribunal's final judgment.[27]

As discovery has revealed, the plaintiffs—and in particular Plenteous' singular controller, Atle Lygren—were not pleased by my decision.[28] They perceived that the Swedish Arbitration Panel might feel some inhibition in awarding over a half-billion

---

**23.** See Parfi I, 794 A.2d at 1225–26; Parfi II, 817 A.2d at 159 n. 37 (citing record showing that this was the case).

**24.** Parfi III, 842 A.2d at 1259–63.

**25.** Id.

**26.** The plaintiffs' preference was to have the option to prosecute this case and the Swedish

Arbitration simultaneously, subjecting Xcelera, at the plaintiffs' sole option, to a dual set of proceedings over the same Challenged Transactions.

**27.** Parfi III, 842 A.2d at 1259–63.

**28.** See, e.g., Macdonald Aff. Ex. 32.

dollars in damages.[29] Moreover, the Stay Order interfered with the plaintiffs' original goal, which was simply to use the arbitration tactically to obtain a declaration that the Underwriting Agreement was invalid and that its arbitration clause was null and void, and to obtain a liability determination that Xcelera had breached that Agreement.[30] By this tactic, the plaintiffs hoped to clear the way for litigation in a U.S. court and exert leverage over the defendants. In fact, they anticipated that after the initial liability arbitration in Sweden, there "would be no more litigation in Sweden."[31] But they wanted the flexibility to go back to Sweden for damages as a last resort if things did not go their way in the United States, and Swedish law gave Plenteous a full decade after the initial Panel ruling to initiate the Damages Phase of the Arbitration before being time-barred. Thus, when the Stay Order issued and this action was put on hold until the Arbitration process was completed, Lygren felt that this court had deprived the plaintiffs of "[their] rights under Swedish law."[32]

The Stay Order also came down at a time when the plaintiffs were changing primary litigation counsel in this case. Their prior counsel, Brown Rudnick, wished to withdraw because they were owed $300,000 in past fees. New counsel, Lieff Cabraser Heimann & Bernstein, had come in on a contingency basis shortly before the Stay Order to represent the plaintiffs in this case. But, Lieff Cabraser had not agreed to represent the plaintiffs in the Swedish Arbitration at all, much less on a contingency fee basis.

After the Stay Order was entered, the plaintiffs did little, if anything, to institute the Damages Phase. The plaintiffs had European counsel who had worked with them on the Liability Phase of the Arbitration. The plaintiffs knew that, given the $569 million damage demand, the advance fee for initiating the Liability Phase would be substantial, and could be as much as "EURO 806,000, plus VAT".[33] Their European counsel had worked for them, it appears, on an hourly rate basis.

Because the plaintiffs really wanted to proceed in Chancery, did not believe they would do as well in arbitration, and did not wish to foot the costs of the Arbitration, they did nothing substantial to get the Damages Phase moving. This is not to say that they did nothing at all; they did have their Swedish counsel, Olof Nilsson, *do some very preliminary work.* In that regard, the plaintiffs were, as noted, advised by Nilsson of the approximate filing fees that would be required by the SCC to initiate the Damages Phase, an estimate that made it plain that it could cost over a half million dollars.

But the serious work of preparing the necessary papers to actually initiate the Damages Phase and to get it going was not begun in earnest. Rather, what the plaintiffs devoted the most energy to was trying to cajole Lieff Cabraser into handling the Damages Phase of the Arbitra-

29. *See, e.g.,* Macdonald Aff. Ex. 10 (advice of plaintiffs' U.S. counsel to plaintiffs in 2000).

30. *See, e.g.,* Macdonald Aff. Ex. 64; Nilsson Dep. at 15–16.

31. Nilsson Dep. at 16.

32. Macdonald Aff. Ex. 32.

33. See, for example, the explanation of the plaintiffs' Swedish counsel on June 2, 2004. Macdonald Aff. Ex. 38 ("In addition to hav[ing] incurred expenses covered, the three arbitrators may together charge between approximately EURO 187,000 and approximately EURO 806,000, plus VAT if required by law.... Said amounts are approximated on basis of the currency conversion rate (USD to EURO) as of today."); Nilsson Dep. at 67, 69.

tion for a contingency fee. Lygren engaged in animated communications with Lieff Cabraser arguing that they owed the plaintiffs a duty to do that or to somehow get this court to lift the Stay Order.

Consistent with its case management practices as to all cases, including ones subject to a stay, on June 28, 2004 this court required the parties in this case to provide a status report in advance of the then-traditional annual call of the calendar. That report was provided by the plaintiffs on August 6, 2004, and stated that the "[p]arties are in the process of initiating" the Damages Phase "and will advise the Court as soon as a schedule can be obtained from the Arbitration Panel."[34]

At the September 13, 2004 call of the calendar over a month later, the plaintiffs could not inform the court of the status of the Swedish Arbitration. That was not a satisfying response because over half a year had elapsed since the Stay Order, and it appeared that the plaintiffs had not even taken the formal steps necessary to initiate the Damages Phase. The court made plain that it expected the plaintiffs to move with alacrity for an obvious reason: if the plaintiffs dallied in finishing the Arbitration, they would delay the completion of this litigation, and thereby cause the sort of inefficiency and unfairness that often results when cases are tried long after the relevant events in question transpired.[35] To make sure that this sort of injustice would not result in this case, the court ordered the plaintiffs to supply a detailed written status report on or before September 27, 2004, setting forth whether an arbitration panel had been convened, the expected timeline for arbitration, and any other details that were available concerning the Swedish Arbitration. On September 23, 2004, I received a letter from the plaintiffs' U.S. local counsel and an attached letter from the plaintiffs' Swedish counsel, advising that Swedish counsel "have been in the process preparing Plenteous' case in full detail prior to the initiation of arbitration proceedings," that Plenteous had already selected its arbitrator for those proceedings, and that Plenteous anticipated making a formal request for arbitration, which would result in the convening of a full arbitration panel, on or before October 18, 2004.[36]

Contrary to the representations made to me by the plaintiffs, Plenteous did not make a formal request to initiate the Damages Phase by October 18, 2004.[37] Instead, on October 27, 2004, I was informed by the plaintiffs' U.S. counsel that Plenteous had been "unable to initiate a formal request for arbitration as previously repre-

---

34. Macdonald Aff. Ex. 41.

35. The plaintiffs' U.S. contingency counsel reported this development in a letter to the plaintiffs dated September 16, 2004, which stated:

At the status conference on Monday, September 13, the Court expressed unhappiness with the lack of information being reported concerning the Swedish arbitration. The Court therefore stated that on or before September 27, 2004, the parties must supply the Court with a *detailed* status report, setting forth whether an arbitration panel has been convened, the expected timeline for arbitration, and any other details that are available concerning the Swedish arbitration. The detailed status report must be submitted by letter. The Court fully expects to learn more details from the parties by that date than that the arbitration is simply 'pending'. *The Court stated that if it is not satisfied that the Swedish arbitration is being undertaken in earnest, then it is prepared to dismiss the Delaware litigation entirely.*

Macdonald Aff. Ex. 43 (emphasis in original).

36. Macdonald Aff. Ex. 47.

37. In fact, to date the Damages Phase has not been initiated.

sented," and that "detailed declarations from both Plenteous and its Swedish counsel" regarding (1) the reasons why Plenteous had not initiated the Damages Phase and (2) Plenteous' next steps would be submitted "as soon as possible."[38]

On February 14, 2005—over a year after the entry of the Stay Order—the defendants moved to dismiss this case for failure to prosecute. On February 18, 2005, the plaintiffs moved to lift the stay. In their motion to lift stay, the plaintiffs stated that "[f]iling the Damages Arbitration in Sweden will require an advance payment by Plenteous of approximately 395.200 EURO, or over $515,000," and claimed that "[c]hanged financial circumstances of Plenteous have rendered it *impossible* for Plenteous to pay the fee that is required to initiate and pursue the Damages Arbitration."[39] The grounds for the plaintiffs' motion were set forth in affidavits from Lygren and the plaintiffs' Swedish counsel Nilsson, both dated December 1, 2004, copies of which were attached to the motion.

As to the inability of Plenteous to pay the fee, Lygren stated that due to a substantial decline in the value of stock held by Plenteous, "Plenteous no longer has the funds to initiate the Damages Arbitration (and pay the requisite advance fees) at this time."[40] Lygren claimed that this fact was not known to him when the plaintiffs reported to the court in September 2004.[41] Lygren also stated that the plaintiffs had not calculated the "exact advance fees to be charged by the Swedish Arbitration Tribunal" as of September 2004.[42]

Seeking to accomplish his long-standing desire to lift the Stay Order, Lygren continued:

25. Furthermore, Xcelera was de-listed from the American Stock Exchange prior to trading on November 15, 2004, last traded at 36 cents per share, and based on Plenteous' best knowledge, due to its having been tapped for hundreds of millions dollars, would not be able to satisfy a judgment in Plenteous' favor stemming from the Damages Arbitration.

26. For the foregoing reasons, Plenteous has not initiated the Damages Arbitration, nor can it afford to in the foreseeable future. Plenteous does not have the resources to raise the funds required to initiate the Damages Arbitration, which would necessarily only involve Plenteous and Xcelera as parties. Plenteous therefore requests that the stay in this action be lifted so that Plaintiffs may seek compensation from all the Defendants in this action.[43]

The affidavit of plaintiffs' Swedish counsel, Nilsson, also contained a similar statement.[44] It also suggested that the plaintiffs, when initiating the Swedish Arbitration in 2000 and afterwards, had never intended to proceed with the Damages Phase, stating that:

The Arbitration was limited to liability for two reasons: (i) the Arbitration was

38. Macdonald Aff. Ex. 59.

39. Paris Aff. Ex. 22 (emphasis added).

40. Macdonald Aff. Ex. 64.

41. *See id.*

42. *Id.*

43. *Id.* Although formally Plenteous and Xcelera would be the only parties to the Damages Phase, as a matter of economic substance, the parties to the JPA Consortium would also be "involved" because they shared an economic interest in the outcome of the Arbitration with Plenteous under the JPA.

44. *Id.*

instigated in the first place pursuant to advice by Plenteous' U.S. counsel to get a favorable ruling to support the U.S. litigation, i.e. a ruling of substance that the underwriting agreement and the arbitration clause contained therein is invalid, because a ruling would avoid some otherwise possible procedural obstacles to the U.S. litigation; and (ii) a quantified claim for compensation would be made in the US.[45]

The defendants were skeptical of the truthfulness of these affidavits, and the court itself had serious concerns about that issue. The defendants suggested that the plaintiffs had engaged in sharp tactics, delay, and games-playing that warranted dismissal of this case. Rather than dismiss the case, I ordered discovery into the question of whether the plaintiffs had engaged in sanctionable delay or made misrepresentations to the court.

Immediately, the plaintiffs impeded the process by failing to produce the required discovery.[46] In May 2005, as briefing on the defendants' motion to compel was concluding, the plaintiffs' U.S. contingency counsel Lieff Cabraser moved to withdraw. Before that motion to withdraw was decided, I heard the motion to compel, granted it, and awarded sanctions in the form of attorneys' fees against the plaintiffs because they had no substantial basis to resist discovery.

Meanwhile, the plaintiffs vociferously resisted Lieff Cabraser's motion to withdraw. Given the sensitivity of that motion's basis, I appointed a special master to hear it. Following a lengthy proceeding before the special master, I adopted his recommendation to grant the motion to withdraw on April 3, 2006 and ordered the plaintiffs to obtain successor counsel by May 15, 2006, or their actions would be dismissed.[47] The deadline was set giving due consideration to the reality that the plaintiffs had known since early 2005 that Lieff Cabraser wanted to withdraw, had known since December 23, 2005 that the Special Master had recommended that the motion be granted, and had been encouraged by the court long before to get on with the process of identifying successor counsel.

May 15 came without the entry of new counsel. Instead, the court received a call from lawyers from the firm of Nystrom Beckman & Paris, saying that they might enter an appearance but needed more time. The court was skeptical given how little new counsel had done to read the file and also wanted to make sure that new counsel did not enter and then seek to withdraw for a reason, such as the plaintiffs' financial condition or strategy for the litigation, which new counsel knew had been a subject of dispute between the plaintiffs and Lieff Cabraser. As to issues that were already in contention, the court wanted, in view of the lengthy history of the case, new counsel to recognize that the court would not permit withdrawal for reasons that were extant and known as of the time of their appearance. The court therefore gave the plaintiffs another sixteen days to have new counsel enter an appearance, or the case would be dismissed. Neither Nystrom Beckman & Paris nor any other counsel entered an appearance as counsel for Parfi and Plenteous by May 31, 2006. The prospective new counsel did not seek clarification from

---

**45.** Macdonald Aff. Ex. 64.

**46.** This included refusing to provide any financial information on Lygren, despite his relationship with Plenteous.

**47.** *Parfi Holding AB v. Mirror Image Internet, Inc.*, 2006 WL 903578 (Del.Ch. Apr. 3, 2006). The plaintiffs' U.S. local counsel also moved to withdraw and her motion was granted. *Id.*

this court, to get assurance that they could seek to withdraw if a new ethical issue arose in the future regarding the case that was not known as of the date of appearance. An order of dismissal was then entered.

Rather than seek re-argument, new counsel then initiated an appeal. On appeal, most of the plaintiffs' argument attempted to convince the Supreme Court that the Stay Order was improper. The plaintiffs failed in that attempt.[48]

But, the plaintiffs were successful in arguing that this court's order requiring new counsel to make a non-withdrawable appearance was improper, insofar as it could prevent counsel from seeking to withdraw in a situation where counsel's ethical obligations required such a move. Thus, the Supreme Court lifted the dismissal order and remanded the case back to this court.[49]

After that, the discovery that the plaintiffs had improperly resisted was finally produced, and these motions were briefed. The defendants expanded their bases for seeking dismissal after discovery, having learned additional facts relevant to the standing of the remaining plaintiffs, Plenteous and Parfi. The defendants also sought an order quantifying the attorneys'

fees and costs the plaintiffs must pay them in connection with the plaintiffs' prior failure to provide discovery. Meanwhile, the plaintiffs renewed their application to lift the Stay Order.

### IV. Legal Analysis

A. Should The Case Be Dismissed Because The Plaintiffs Made Materially Misleading Statements To The Court In Order To Obtain Relief From The Stay Order On False Pretenses?

■ Although initially pressed primarily under the rubric of Court of Chancery Rule 41(e),[50] the defendants' motion to dismiss the entire case more properly falls under Rule 41(b)[51] as well as the inherent authority of this court to hold litigants responsible for misconduct in the litigation process.[52]

As the plaintiffs point out, the use of Rule 41(e) to fault them for the failure of this litigation to proceed between the entry of the Stay Order on February 12, 2004 and February 18, 2005 would be odd precisely because the Stay Order was in place. Given that, the court itself would not have expected substantial progress in the Chancery case.

---

**48.** *Parfi IV*, 926 A.2d at 1074–76.

**49.** *Id.* at 1076–77.

**50.** Court of Chancery Rule 41(e) states:
Subject to the provisions of Rules 23, 23.1 and 23.2 in each cause pending wherein no action has been taken for a period of 1 year, the Court may upon application of any party, or on its own motion, and after reasonable notice, enter an order dismissing such cause unless good reason for the inaction is given, or the parties have stipulated with the approval of the Court as to such matter.
Ct. Ch. R. 41(e).

**51.** Court of Chancery Rule 41(b) states in pertinent part: "For failure of the plaintiff to prosecute or to comply with these Rules or

any order of court, a defendant may move for dismissal of an action or of any claim against the defendant...."

**52.** *See, e.g., Gebhart v. Ernest DiSabatino & Sons, Inc.*, 264 A.2d 157, 159 (Del.1970):
The authority of the Superior Court to dismiss a plaintiffs action, for failure to prosecute or to comply with its Rules or orders, is clear. The power has its origins in the common law judgments of non suit and Non prosequitur. It is an inherent power of the Trial Court arising from the control necessarily vested in the Court to manage its own affairs and to achieve the orderly and expeditious disposition of its business. This power has been recognized by Superior Court Civil Rule 41(b).
(footnote omitted).

■ That is true, of course, but does not address the core problem. In a situation when this court stays its case until the plaintiffs complete prosecution of a related matter in another forum, this court is entitled to hold the plaintiffs accountable for prosecuting the related matter with due diligence. Otherwise, this court would face the prospect of trying its case at a time when memories have dimmed and there is a great hazard that the potential for error that always is present in human fact-finding about past actions will, combined with a less reliable record, result in an unjust result.

Thus, when the plaintiffs' counsel could not even say six months after the Stay Order that the Damages Phase had been initiated, the court was concerned, as that kind of torpor in simply initiating the Damages Phase of the Swedish Arbitration did not bode well for the timely completion of that Arbitration, especially in view of the reality that the plaintiffs had barely moved forward in this litigation from the time of the Supreme Court's remand order in 2002 until the Stay Order was entered.

The plaintiffs clearly understood that the court expected to hear by September 27 that the steps necessary to get the Damages Phase moving forward had been or would shortly be taken.[53] That is precisely why the September 23 submission was at pains to make clear that the Damages Phase would be formally commenced

no later than October 18, 2004. Notably, it was only after the court made its expectations clear that Swedish counsel began drafting the Request for Arbitration and a more developed Statement of Claim necessary to commence the Damages Phase.[54] This deserves emphasis. *The Request for Arbitration was necessary to commence the Damages Phase as was a completed Statement of Claim, and Nilsson was not even instructed to get these documents finalized until October 13.*

The most problematic behavior that the court must address, and this is really the subject of the defendants' motion, came next. From the record, it is apparent that Lygren was still chafing under the Stay Order and desired to avoid its requirement that Plenteous finish the Arbitration process before proceeding in this court.[55] Although Lygren appears to have given thought to actually going through with the arbitration process, in mid-October 2004, Lygren made the decision that he would not do so.[56]

It is clear that his decision to cause Plenteous not to proceed was not based on the fact that it was impossible for Plenteous to do so. Rather, Lygren simply believed that the costs of doing so exceeded the probable benefits, and he argued to his lawyers that they should tell the court that it was wrong to have entered the Stay Order and should reverse itself.[57] In fact,

---

**53.** *See, e.g.,* Macdonald Aff. Ex. 45; Macdonald Aff. Ex. 43.

**54.** *See* Nilsson Dep. at 92 ("Q. So if I understand your testimony correctly, on October 13th you started drafting a request for arbitration and a more developed statement of claim and within one or two days you were instructed by Mr. Lygren to stop working on the arbitration, is that correct? A. Yes."); Macdonald Aff. Ex. 64 (Nilsson stating: "Upon receipt from the said gentleman [Lygren. Lindbo and Gillberg] on 13th October 2004 of additional information and evidence, we im-

mediately started drafting a request for arbitration and a more developed statement of claim.").

**55.** *See, e.g.,* Macdonald Aff. Exs. 51, 56, 57; Nilsson Dep. at 84.

**56.** *See Macdonald* Aff. Ex. 55; Lygren Dep. at 158–159; Nilsson Dep. at 72–73.

**57.** *See, e.g.,* Macdonald Aff. Exs. 50, 51, 56, 57.

he told his lawyers that Plenteous was not incapable of funding the Damages Phase but that it had concluded that to do so was not a wise decision in view of the "alternative avenue" of litigating in Chancery "available to us."[58] But, he did not tell that version of events to the court.

Instead, when his lawyers pushed back and suggested that this sort of after-the-fact cost-benefit analysis was not likely to be a convincing explanation for not commencing the Damages Phase on October 18, 2004 as promised, Lygren came up with a story that was not only literally false, but designed to have the court reverse its Stay Order determination on false pretenses. Thus, only after previously telling his lawyers that it was not in Plenteous's interests on a cost-benefit basis to proceed with the Damages Phase and meeting with concerns by them that that explanation might raise concerns on the part of this court, Lygren provided input on an early draft of Nilsson's affidavit with these words:

> It is not my statement to you that Plenteous does not wish to commence the Damage Arbitration but rather that at this particular moment in time it is not possible for Plenteous to commence it due to the costs involved.[59]

Thus, the impossibility story was invented and then submitted to this court. That story was based on the notion that Plenteous was a separate corporation whose distinct identity was entitled to respect[60] and for which it was literally "impossible" to muster the funds to proceed with the

Damages Phase. This impossibility had supposedly arisen because Plenteous's sole "liquid"[61] assets were stock in a corporation called Apptix ASA, whose shares were listed on the Norwegian Stock Exchange and whose shares had come under severe pressure from a short-seller. Lygren told the court that he had only learned of that adverse development after the September 23 report was given to the court.[62] Lygren also purposely led the court to believe that the size of the fee required to initiate the Damages Phase was unexpected.

The reality that emerges from the record is quite different. Lygren knew going into September that the fee required to initiate the Damages Phase was likely to be substantial. He had estimates in hand.[63] His reference in his affidavit to not having calculated the "exact" amount of the fee that would ultimately be payable is, I concede, so cute that it precludes being labeled a literal falsehood. What is obvious is that it was advanced to suggest to the court that the plaintiffs received, after their September 23 submission, an estimate of costs that was unexpectedly large. That suggestion was false.

Even more clearly false was the representation that it was "impossible" for Plenteous to fund the required filing fees (and for that matter, the prosecution of the Damages Phase). That was literally false for a couple of key reasons. The first is that Plenteous owned Apptix stock, which had a market value of $11.4 million as of October 19, 2004, and over $4 million of

**58.** Macdonald Aff. Ex. 57.

**59.** *See* Macdonald Aff. Ex. 60.

**60.** The plaintiffs have pushed this line consistently in this court. *See, e.g.,* plaintiffs' letter to the court, Aug. 4, 2007 at 4; Pls.' Opp. Br. at 27.

**61.** This is the plaintiffs' term. *See, e.g.,* Macdonald Aff. Ex. 64 ("the sole source of liquidity for Plenteous").

**62.** *See* Macdonald Aff. Ex. 64.

**63.** *See* Macdonald Aff. Ex. 38; Nilsson Dep. at 67, 69.

which was unencumbered and free to be sold.

The second is that Plenteous had other less liquid, but still substantial, assets, which a sophisticated businessman like Lygren would know how to use to generate cash. Lygren has not been very forthcoming about Plenteous's resources, but admitted that its resources were not limited to shares of Apptix.[64]

The third reason is that Lygren himself had sufficient resources to fund the Damages Phase. This fact might not be relevant if Plenteous were actually an adequately capitalized corporation that respected corporate formalities. But, that is not what it is. It is nothing more and nothing less than a personal tool that Lygren uses to hold his personal wealth. It does what he wants when he wants. Although the record regarding Plenteous has been difficult for the defendants to develop given Lygren's resistance to discovery into that question, one of the plaintiffs' own arguments is, ironically, the best way to prove the point that Plenteous and Lygren himself are entirely indistinct. According to the plaintiffs, one of the reasons that Plenteous was inhibited from selling a bloc of its Apptix stock in order to fund the Damages Phase was that a material portion of that stock was pledged to a bank.[65]

As it turns out, however, the pledge was in part attributable to Lygren's decision to have Plenteous give $1.3 million to himself in the summer of 2003. By that pledge, Plenteous relieved Lygren of a personal obligation to the bank in the amount of $1.3 million. That relief was provided to Lygren WITHOUT CONSIDERATION AND NO RECEIVABLE FROM LYGREN IS BOOKED AT PLENTEOUS.[66] With $1.3 million, Plenteous could have funded the entire filing fee and the costs for counsel to finish the Damages Phase of the Arbitration. In this regard, Lygren admits that he had, at all relevant times, sufficient funds to cover the costs of initiating the Damages Phase.[67] Put simply, the representation that it was impossible for Plenteous to fund the Damages Phase was clearly false and designed to influence the court into lifting the Stay Order on false pretenses.

Similarly, it was not true that Lygren was unaware of downward pressure on Apptix stock as of September 20. He already suspected short-selling by a hedge fund in early September.[68] Indeed, the

---

**64.** As Lygren admitted during his deposition, Plenteous actually has many assets other than Apptix stock. *See* Lygren Dep. at 142.

**65.** *See* Pls.' Opp. Br. at 23.

**66.** As is typical, the plaintiffs were vague about this. But, in a June 4, 2008 letter to the court, they essentially admitted that Lygren had caused Plenteous to assume a $1.3 million debt for him without consideration and that this resulted in an encumbrance of some of the Apptix shares. The plaintiffs promised to provide more information if that was in fact not the reality and have failed to do so.

**67.** *See* Lygren Dep. at 150, 164–165; letter from plaintiffs' U.S. counsel to this court dated August 10, 2007 at 4 ("... Plaintiffs are prepared to stipulate that Mr. Lygren, had sufficient *personal* assets to fund the fees necessary to initiate and prosecute the damages phase of the Swedish Arbitration.") (emphasis in original).

**68.** *See* Paris Aff. Exs. 82–89. I do not base this decision on the notion that Lygren was not genuinely concerned by movements in Apptix's stock price in autumn. He appears to have had a feisty dispute with HBK Investments, L.P., a large investor in Apptix, over whether it was engaged in short-selling. What I base my decision on is that nothing about that dispute made it impossible for Plenteous to fund the Damages Phase and that that dispute was not the reason Plenteous did not proceed. Instead, it was a pretext Lygren used as a false excuse to do what he

reference in his affidavit to a 50% stock drop is itself unclear in a way that seems advertent, because it does not explain that the price of Apptix had dropped from its high in August by almost 14% as of September 23, 2004 and by roughly 30% as of October 15, 2004. But even with that drop, by the time Lygren decided not to proceed with the Damages Phase, Apptix shares were at approximately the same price as they were when the Stay Order was entered.[69]

The plaintiffs also failed to share another reality with the court. Although Plenteous was the only successful party in the Arbitration, under the JPA others of the plaintiffs, including Grandsen and Gillberg, stood to share in any recovery from the Damages Phase. Furthermore, Gillberg was apparently prepared to fund his share of the costs, but was then met with Lygren's refusal to proceed.[70]

In the twenty-sixth paragraph of his affidavit to the court—which was echoed in paragraph three of the plaintiffs' motion to lift stay—Lygren implied that Plenteous was the only plaintiff with an interest in the Arbitration and therefore with an incentive to put its resources up to fund the filing fee.[71] In fact, others of the plaintiffs stood to share in any recovery by Plenteous because the parties to the JPA-created Consortium had pooled their claims and were sharing on a percentage basis in any recovery by any Consortium member in the Swedish Arbitration. Although Plen-

teous's share was very high, others stood to receive the rest.

The factual record is voluminous. But the underlying reality can be stated briefly. The genuine reason that the Damages Phase was not filed was that Lygren had never desired to proceed with his damages claim in Sweden, and preferred to litigate that question in this court, while reserving the option of resuming proceedings in Sweden if things did not turn out well here. Therefore, he spent most of his energy after the Stay Order was entered in an attempt to get his lawyers to do something to get the Stay Order lifted. Only when the court called the question at the call of the calendar did any work in earnest on the Damages Phase begin. And then Lygren quickly squelched it, not because it was impossible to proceed, but because he did not want to proceed, although there were adequate resources to do so.

Rather than being straightforward with the court, Lygren concocted an affidavit designed to give the court a false impression that dire and unexpected financial circumstances precluded Plenteous from proceeding. That concoction was designed to get the court to lift the Stay Order, permitting Lygren and the other plaintiffs what they wanted all along, a chance to proceed first with the Chancery case and then, and only then, proceed to Damages Arbitration if necessary.[72]

had consistently desired since the entry of the Stay Order, to convince the court to lift that Order.

69. The price of Apptix stock on October 15, 2004 was 13.00 NOK and was at 13.50 NOK on the day the Stay Order was issued, February 12, 2004. *See* Macdonald Aff. Ex. 74.

70. *See* Gillberg Dep. at 9.

71. *See* Macdonald Aff. Ex. 64.

72. Although Lygren presented the share drop reasoning as the most important reason for Plenteous' October 15, 2004 decision not to initiate the Damages Phase, this reasoning is mentioned nowhere by him or others in (internal) correspondence and discussions about this issue in the record during the second half of October 2004. *See, e.g.,* Macdonald Aff. Ex. 57, 58, 60, 61. Only after *Lieff Cabraser* reiterated to Lygren at the end of October that simply informing the court that Plenteous did not desire to go forward with the Damages

I do not reach these factual conclusions lightly. I have reviewed the factual record carefully and come to the conclusion that there is clear and convincing evidence supporting my findings.[73] Indeed, the most compelling evidence consists of Lygren's own admissions and statements, which clearly support a finding that he conjured up a misleading story to give to this court for tactical advantage.

I agree with the defendants that this wrongful course of conduct implicates this court's authority under Rule 41(b), to dismiss a case when the plaintiffs fail "to prosecute" or "comply with" the court's rules or orders.[74] I also agree with them that it implicates this court's inherent authority to police the litigation process, to ensure that acts that undermine the integrity of that process are sanctioned.[75]

When this court requires parties to provide status reports, it obviously expects that they be intended to be accurate. The plaintiffs knew this, as their counsel made clear to them that the court was dissatisfied by the lack of substance provided at the call of the calendar and expected a thorough and accurate report by September 27, 2004. The plaintiffs also knew that the court had made clear that Plenteous had a duty to prosecute the Damages Phase diligently because this case could not proceed until the Arbitration was complete.

Having told the court on September 23 that the Damages Phase would be initiated no later than October 18, 2004—a very specific representation—the plaintiffs were duty bound to explain themselves accurately and non-misleadingly when they then did not honor their prior representation. Instead of being candid, the plaintiffs gave the court a false and misleading account of their rationale.

At that juncture, candor might well have resulted in the plaintiffs receiving a livable result. The plaintiffs could have told the court candidly that, as a matter of self-interest, they had concluded it was not cost-effective to proceed with the Damages Phase of the Arbitration and that they wished to have the Stay Order lifted. The defendants might then have reasonably responded that the plaintiffs had to make an election, either proceed with the Damages Phase of the Arbitration immediately or agree to an order dismissing any claims made in the Arbitration with prejudice, pointing out that it was unfair to allow the plaintiffs to reargue the Stay Order well after the time for a Rule 59 motion had come and gone. Moreover, the defendants would have likely also said that it was no more fair for Xcelera to have the potential of a later, overlapping Damages Phase hanging over their head during this litigation at that late point than it was when the court originally entered the Stay Order. The court could then have grappled with the real issue in controversy based on a forthright submission by the plaintiffs.

But instead, the plaintiffs tried to win the day by telling the court that Plenteous was impecunious and simply could not proceed. Admittedly, the plaintiffs did note that Xcelera's financial troubles made the potential benefits of the Damages Phase

---

Phase and wanted a *de facto* reargument of the Stay Order would not likely be productive did Lygren shift course and start telling his counsel that it was impossible for Plenteous to proceed.

**73.** *Smith v. Williams,* 2007 WL 2193748, at *4 (Del.Super.Ct. July 27, 2007); *see also*

*Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1118 (1st Cir.1989).

**74.** Ct.Ch.R. 41(b).

**75.** *See, e.g., Gebhart,* 264 A.2d at 159.

less attractive, but the key issue in their version of events was the "impossibility" of Plenteous proceeding in view of its supposedly singular interest in the Arbitration, its financial situation, lack of obtainable resources, and the unexpectedly high costs of filing for the Damages Phase. The plaintiffs thus tried to elicit the sympathy of the court based on a false and misleading story and obtain a tactical advantage over the defendants.

In my view, this sort of behavior can only be met with the admittedly harsh sanction of dismissal. The integrity of the litigation process is fundamentally undermined if parties are not candid with the court. Parties have every right to file motions for reargument or to suggest that a prior course of case management be altered in light of changed circumstances. Judges are humans and by definition susceptible to error, and changed circumstances often justify a different approach to case scheduling.

But when a party fails to comply with its prior representation to the court and seeks an alteration in a prior court order it did not like, its explanation for changing course should be straight-forward, not intentionally misleading. This is not a novel thought. Under both the decisional law of this state, that of other states, and that of the federal courts, the importance of candor to the tribunal is well-recognized.[76]

■ When a party makes materially misleading statements to the court in order to gain an advantage, a court has "clear" authority to dismiss a plaintiff's action for failure to comply with its Rules.[77] This "is an inherent power of the Trial Court arising from the control necessarily vested in the Court to manage its own affairs and to achieve the orderly and expeditious disposition of its business."[78] This authority is consistent with the U.S. Supreme Court's interpretation of the inherent authority of federal courts to sanction bad-faith conduct, especially when the court finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled."[79] Moreover, the Court of Chancery Rules specifically authorize stringent sanctions where parties have committed fraud on the court. Rule 60(b) authorizes the court to "set aside a judgment for fraud on the court" in the interests of "the integrity of the judicial process."[80]

■ To permit the plaintiffs to proceed would, by example, encourage other parties to play fast and loose with the truth when speaking to this court.[81]

---

76. See, e.g., Hazel–Atlas Glass Co. v. Hartford–Empire Co., 322 U.S. 238, 246, 64 S.Ct. 997, 88 L.Ed. 1250 (1944) ("[Lack of candor] is a wrong against the institution set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society."); E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage, 744 A.2d 457, 461 (Del.1999) ("Candor and fair-dealing are, or should be, the hallmark of litigation and required attributes of those who resort to the judicial process.").

77. Gebhart, 264 A.2d at 159.

78. Id.; see also Smith v. Williams, 2007 WL 2193748, at *3 ("[T]he Court is necessarily accorded considerable latitude in dealing with serious abuses of the judicial process.").

79. Chambers v. NASCO, Inc., 501 U.S. 32, 46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); see also Aoude, 892 F.2d at 1118 ("It strikes us as elementary that a federal district court possesses the inherent power to deny the court's processes to one who defiles the judicial system by committing a fraud on the court.").

80. Credit Lyonnais Bank v. Pathe Commc'ns Corp., 1996 WL 757274, at *1 (Del.Ch. Dec. 20, 1996).

81. I suppose the cynical would say that parties mislead courts all the time and that therefore this sort of gamesmanship is not extraor-

Moreover, lesser sanctions are awkward at this point. Because of the plaintiffs' overall lack of diligence, including doing virtually nothing between the time of the original remand order and the Stay Order, their long-running battle with Lieff Cabraser, and failure to earlier secure successor counsel, it is now eight years after the Challenged Transactions occurred. Although it would be possible, I suppose, to impose the burden of persuasion as to every issue on the plaintiffs, and to give the defendants the nod on any issue as to which there is doubt due to the passage of time, I do not believe that sanction, which would be awkward to administer, would be serious enough, given the false representations made to the court.[82] Rather, I believe this situation to justify the entry of a dismissal. When plaintiffs come to this court seeking equity, they are expected to do equity by the other parties to the case and to the court itself, by being candid.[83] The plaintiffs here have forfeited their right to equity by their own inequitable conduct.[84]

The dismissal order will dispose all of the plaintiffs' claims, whatever their nature (i.e., direct or derivative).[85] For the sake of completeness, however, I will also address the defendants' claims that the plaintiffs lack standing and do not qualify as adequate derivative plaintiffs.

## B. *Standing*

The defendants claim that evidence that arose during discovery and other developments have revealed that Plenteous and

---

dinary enough to justify dismissal. But if in fact misleading statements to courts are common, a notion I choose not to embrace, it is even more important that strong sanctions be imposed when a party's misleading statements are exposed.

82. If I were to have to shape an alternative remedy, it would involve at least the following elements: 1) burden-shifting and evidentiary presumptions of the type outlined; 2) a requirement that the plaintiffs pay the defendants' attorneys fees for litigating the motions now before the court; 3) dismissal of the claims in the Swedish Arbitration with prejudice; and 4) payment of Xcelera's attorneys fees incurred in defending the abandoned Swedish Arbitration.

83. This arises from one of the principle maxims of equity—"he who comes into equity must come with clean hands." *Bodley v. Jones*, 59 A.2d 463, 469 (Del.1947). The purpose of the doctrine of unclean hands is to maintain the integrity of the courts of equity and shield them from misuse by litigants whose actions denigrate the very principles of equity the courts are meant to uphold. *See Nakahara v. NS 1991 Am. Trust*, 718 A.2d 518, 522 (Del.Ch.1998); *In re Enstar Corp.*, 593 A.2d 543, 552 (Del.Ch.1991); *Skoglund v. Ormand Industries, Inc.*, 372 A.2d 204, 213 (Del. Ch.1976).

84. The plaintiffs have pointed to the six factors outlined in the Third Circuit's *Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863 (3d Cir.1984), decision as aiding them. I do not believe these factors aid the plaintiffs at all. The record clearly shows that Lygren concocted a false explanation in a bad faith attempt to persuade this court to lift the Stay Order under a false impression as to the material facts. That sort of purposeful sharp practice warrants a harsh remedy under the *Poulis* factors, especially in light of the overall torpor with which the plaintiffs have proceeded and the lack, in my view, of an appropriate alternative remedy, given the passage of time and the seriousness of the misconduct at issue.

85. The plaintiffs have not argued that Parfi should be distinguished from Plenteous on this score. Given that and given that Parfi's litigation leader, Lindbo, has shaped the litigation strategy in this case with Lygren and did nothing to clarify the misimpressions Lygren gave, I see no basis to distinguish between them. In this respect, it is also notable that Parfi's percentage interest in this case—as a Consortium member—is now only 1%, with Plenteous holding an interest of over 90%.

Parfi now lack standing to serve as derivative plaintiffs.[86]

■■■ Section 327 of the Delaware General Corporation Law and Court of Chancery Rule 23.1 specify the minimal requirements that must be met by derivative plaintiffs.[87] Taken together, they require that a "plaintiff, bringing a derivative suit on behalf of a corporation, must be a stockholder of the corporation at the time he commences the suit and must maintain that status throughout the course of the litigation."[88] Thus, to have standing a derivative plaintiff must satisfy two tests: 1) the contemporaneous ownership test, which requires stockholders to have owned stock at the time of the wrong complained of,[89] and 2) the continuous ownership rule requiring stockholders to maintain their shareholder status throughout the litigation.[90] The defendants argue that Plenteous and Parfi both fail to satisfy the continuous ownership test and that Parfi also fails to satisfy the contemporaneous ownership requirement as to some of the Challenged Transactions.

### 1. *Plenteous*

Plenteous fails the continuous ownership requirement because it is not currently a shareholder of Mirror Image.

■■■ Plenteous has not owned stock in Mirror Image since November 2002. In November of that year Mirror Image effected a 1–for–100,000 share reverse stock split. This left Plenteous with 0.94425 shares of Mirror Image stock. Because Mirror Image's certificate of incorporation had been previously amended to eliminate fractional shares, all fractional shareholders after the split were paid the fair value of their post-split shares. Accordingly, Plenteous was sent a check for $944.25 and no longer owns any shares in Mirror Image.

Faced with the defendants' argument that Plenteous is not a Mirror Image stockholder, the plaintiffs now belatedly

---

86. *See* Defs.' Supp. Br. at 46–47; Defs.' Rep. Br. at 19–22.

87. Section 327 provides that:

> In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation *at the time of the transaction of which such stockholder complains* or that such stockholder's stock *thereafter devolved upon such stockholder by operation of law.*

8 Del C. § 327 (emphasis added). Rule 23.1 provides:

> In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall allege that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law.

Ct.Ch.R. 23.1.

88. *Heit v. Tenneco, Inc.*, 319 F.Supp. 884, 886 (D.Del.1970) (citing *Hutchison v. Bernhard*, 220 A.2d 782 (Del.Ch.1965)); *see also Feldman v. Cutaia*, 2007 WL 5211892, at *6 (Del. Ch. Aug. 1, 2007), aff'd, 951 A.2d 727, 2008 WL 2223084 (Del. May 30, 2008) (citing *Lewis v. Anderson*, 477 A.2d 1040, 1046 (Del.1984)).

89. "[A] stockholder plaintiff must either have been a stockholder at the time of the transaction of which she complains or her stock must have devolved upon her thereafter by operation of law." *Schoon v. Smith*, 953 A.2d 196, 2008 WL 375826, at *4 (Del. Feb. 12, 2008) (emphasis omitted).

90. *Lewis v. Anderson*, 477 A.2d at 1049. *See also* R. Franklin Balotti & Jesse A. Finkelstein, The Delaware Law of Corporations & Business Organizations § 13.11 (2008) ("Thus, a plaintiff who is not a stockholder, or who ceases to be a stockholder during the pendency of his suit, loses standing to maintain a derivative action.").

assert that the entire transaction was a fraud designed to deprive stockholders of their right to sue derivatively.[91] But Plenteous never brought suit to enjoin or rescind the reverse stock split. Nor have the plaintiffs ever brought a new suit or sought to amend their complaint to allege breaches of fiduciary duty with regard to the reverse stock split.[92] Mirror Image contends that it had legitimate tax and financial reasons for carrying out the transaction that had nothing to do with eliminating Plenteous as a stockholder in order to deprive it of derivative standing. This court need not examine the substance of the reverse split to decide this motion. The time for the plaintiffs to bring a challenge to the reverse split has long come and gone; indeed, it is nearly a full three years after the original three years limita-

tion to challenge the reverse split expired.[93] As a result, the plaintiffs are in no position to invoke the exception to the continuous ownership rule in *Lewis v. Anderson*, which applies when the transaction that deprives the plaintiffs of ownership is itself the subject of a claim of fraud.[94] This is a narrow exception that should be cautiously applied even when the affected plaintiffs act with diligence.

█ Here, the plaintiffs admit that they never took any steps to challenge the reverse split, and their argument that their pending claims implicitly acted as a challenge to that independent transaction lacks substance. If a derivative plaintiff is subject to a transaction that will deprive it of its shares, it must move with alacrity to challenge that independent transaction, or it will lose standing.[95] It cannot assume

---

91. That desire would have been rather incompletely achieved by the reverse split, because Parfi was not eliminated as a stockholder in the reverse split.

92. THE COURT: ... there's never been any claim made about the reverse split; right?
[PLAINTIFFS' COUNSEL]: There has not been a claim in the complaint for the reverse split, no, there has not.
THE COURT: Well, where else would the claim be found? ... Where else would a claim attacking the reverse stock split as a fraud simply done to deprive your client of derivative standing, where would that allegation be?
[PLAINTIFFS' COUNSEL]: It is—it is not pled, Your Honor.
THE COURT: And so it doesn't exist in any form.
[PLAINTIFFS' COUNSEL]: No, Your Honor.
06/04/08 Tr. at 90–91.

93. The limitations period for a breach of fiduciary duty claim is three years. *E.g., Franklin Balance Sheet Inv. Fund v. Crowley*, 2006 WL 3095952, at *7 n. 44 (Del.Ch. Oct. 19, 2006).

94. *Lewis v. Anderson* held that the standing requirements do not apply "(1) where the merger itself is the subject of a claim of fraud; and (2) where the merger is in reality a reor-

ganization which does not affect plaintiff's ownership of the business enterprise." 477 A.2d at 1046 n. 10 (citations omitted). But, the *Lewis v. Anderson* exceptions are narrow ones to the general and "well established [rule] that a merger which eliminates a derivative plaintiffs ownership of shares of the corporation for whose benefit she has sued terminates her standing to pursue those derivative claims [because the] derivative claims pass by operation of law to the surviving corporation, whose board of directors then has the sole right and standing to prosecute the action." *Lewis v. Ward*, 852 A.2d 896, 900–01, 904 (Del.2004); *see also* DENNIS J. BLOCK, NANCY E. BARTON & STEPHEN A. RADIN, THE BUSINESS JUDGMENT RULE FIDUCIARY DUTIES OF CORPORATE DIRECTORS 1391 (1998) (noting that these exceptions have been narrowly construed).

95. *See Bokat v. Getty Oil Co.*, 262 A.2d 246, 249 (Del.1970) (holding that a plaintiff cannot continue a derivative action after a merger when the plaintiff did not make a direct attack on the merger and stating that: "If a proposed merger is sought to be used for the coverup of wrongful acts of management, a Court of Equity ... will protect the innocent stockholder victim.... This plaintiff, however, took no direct action to restrain or to attack the merger").

that its pending claims are an "implicit" challenge to that independent transaction. Corporations must continue to operate during the pendency of a derivative suit, and a plaintiff who wishes to maintain its standing must act to protect its interests. Plenteous did not do that, and it cannot now base its standing on a time-barred claim that the reverse split was effected as a fraud.[96] It would be inequitable and prejudicial to the defendants to have to litigate at this late date the propriety of a nearly six-year-old transaction.

## 2. *Parfi*

The defendants challenge Parfi's standing for two independent reasons: 1) that Parfi fails the contemporaneous ownership rule as to the April and July Subscriptions; and 2) that Parfi fails the continuous ownership rule because it divested itself of any economic interest in Mirror Image during the course of this litigation. I address those arguments in turn.

### a. *Contemporaneous Ownership*

■■■■ Ordinarily, in order to meet the contemporaneous ownership requirement of Section 327, a plaintiff must have owned stock at the time each of the transactions of which it complains occurred. By its own admission, Parfi did not own Mirror Image stock as of the April and July Subscriptions. Therefore, Parfi attempts to invoke a narrow exception to the contemporaneous ownership rule that applies when a plaintiff obtains its shares by operation of law. But that narrow exception is inapplicable here, because "[a] transfer of

shares by operation of law means that the shareholder acquires the shares *without* any act or cooperation on his or her part."[97] Parfi engineered its acquisition of its Mirror Image shares through contracts and so does not qualify.

■■■■ In their complaint, the plaintiffs referred to Parfi as "the successor-in-interest to [Mirror AB]," and the previous opinions in this case cite it as such.[98] But as discovery revealed, Parfi is not in fact the successor-in-interest to Mirror AB, and Parfi's stock did not devolve upon it "by operation of law" as the term is understood under Delaware law. Instead, Parfi simply purchased Mirror AB's Mirror Image shares. In May 1999, after Mirror AB, Mirror Image's original parent company, changed its name to Drax International AB, it entered into a contract essentially selling its business and assets to Parfi on October 14, 1999.[99] But, that contract did not cover the shares in Mirror Image, although Parfi somehow purchased whatever claims Drax had relating to Mirror Image, and signed the Joint Prosecution Agreement with Plenteous, Gillberg, and other parties on October 28, 1999.[100] But it was not until a few days later, on November 3, 1999, that Parfi actually acquired Mirror AB's shares of Mirror Image in a separate agreement with Drax for nominal consideration (one Swedish kroner, the equivalent of less than twenty cents).

Equally relevant is the fact that Parfi is not in fact the corporate successor of Mir-

---

96. The reverse split clearly was not a "reorganization which [did] not affect plaintiff [Plenteous'] ownership of the business enterprise." *Lewis v. Anderson*, 477 A.2d at 1046 n. 10.

97. WILLIAM MEADE FLETCHER, CYCLOPEDIA OF THE LAW OF CORPORATIONS § 5981 (2004) (emphasis added). For example, "the concept has frequently been applied to situations where a

plaintiff acquired interests in shares as a result of rights obtained through a will." *Id.*

98. *See, e.g.*, *Parfi IV*, 926 A.2d at 1073 n. 1.

99. *See* Macdonald Aff. Ex. 5.

100. *See* Macdonald Aff. Ex. 6.

ror AB. It is a separate corporation that purchased certain assets of Drax. Also relevant is the fact that the stockholders of Parfi were not identical to the stockholders of Mirror AB. Many of Parfi's stockholders were former Mirror AB stockholders, but they did not own Parfi in the same percentage as they owned Mirror AB. Moreover, Parfi appears to have raised new capital by touting the value of the litigation rights it had supposedly acquired. That is, it sought out new investors by pitching the value of a derivative claim, as well as the value of the claims in the Swedish Arbitration.

Given these facts, it is obvious that Parfi did not acquire its shares by operation of law in the sense relevant to the application of the contemporaneous ownership rule. Rather, it explicitly went out and bought shares after the wrongs it challenged. Therefore, Parfi is barred from challenging the April and July Subscriptions because it was not a stockholder of Mirror Image until after the Subscriptions were completed.

### b. *Continuous Ownership Rule*

 Discovery has revealed that during the course of this litigation, Parfi emptied itself of any economic interest in Mirror. The defendants contend that by doing so, Parfi has rendered itself an inadequate derivative plaintiff. In my view, that argument is correct but awkwardly framed. For reasons I detail, Parfi, in my view, violated the substantive policy behind the continuous ownership rule and lost derivative standing.

The facts relevant to this argument are clear, if unusual. The unusual part results from the plaintiffs' own actions, which involved their entry into contractual arrangements that purported to allocate economic interests in the outcome of claims belonging to Mirror Image in this derivative suit.

From the signing of the JPA, the various plaintiffs appear to have opened up a litigation bazaar and freely traded interests in this litigation and the Swedish Arbitration. The participants in this litigation rights market refer to themselves as the Consortium. It is undisputed that Parfi soon ran into problems meeting its obligations under the JPA. Either because it feared action by its creditors, or for tax reasons, or for a combination of the two reasons, Parfi at one point transferred all of its claims and rights to recovery to a subsidiary, Wyeshaw Ltd., while retaining record ownership of its Mirror Image shares. By late 2002 or early 2003, Parfi defaulted on its obligations under the JPA and forfeited any rights of recovery in this action or the Swedish Arbitration.[101] In fact, to avoid insolvency, Gillberg, Lindbo, and Lygren arranged for Parfi to sell half of its Mirror Image shares to other members of the Consortium.[102] No doubt in recognition that it would be difficult to remain as a plaintiff when it had no right of recovery and knowing that if faced upcoming conferences with the court, Parfi engaged in a January 2005 transaction whereby it bought back the shares it had sold to the Consortium for around $145,000 and received in exchange a 1% interest in the Delaware litigation for itself and another 0.4% on behalf of a company con-

---

**101.** Under the JPA, specifically section 9 thereof, in the event that a party to the JPA fails to timely fulfill its obligations under the JPA, that party's allocation percentage of recovery will be amended to zero. Thereafter, that party has no further rights or entitlement to participate in any judgment or settlement obtained by the parties to the JPA. *See* Macdonald Aff. Ex. 6.

**102.** *See* Paris Aff. Ex. 99.

trolled by Lindbo.[103] Consistent with its activities as a litigation rights market maker, Parfi had earlier offered its shareholders a chance to invest directly in the Consortium, and apparently got 300 of its stockholders to exchange cash for a 5% interest in any recovery in this case.

Parfi argues that none of these facts affect its standing because at all times it held on to nominal ownership of some Mirror Image shares. As a result, it contends that it literally was a continual owner of Mirror Image, and thus there was no literal violation of Section 327 and Rule 23.1.

But this is a court of equity, and the mere satisfaction of the literal terms of Section 327 and Rule 23.1 does not mean that this court cannot fashion common law rules of standing to address novel problems. In this respect, it must be remembered that derivative suits raise important policy considerations because they permit stockholders to take action in place of the corporation's board of directors. For that reasons, our law has embraced certain doctrines designed to better ensure that the derivative suit mechanism is used responsibly and for purposes consistent with the best interests of the corporations whose interests are ultimately at stake.[104]

The obvious purpose of the continuous ownership rule is to ensure that the plaintiff prosecuting a derivative action has an economic interest aligned with that of the corporation and an incentive to maximize the corporation's value. Admittedly, the lack of any substantiality of ownership requirement limits the extent to which the continuous ownership rule checks the potential for abuse inherent in the derivative suit context, but nonetheless it does set an important, policy-based minimum.

Section 327 and Rule 23.1 were written at a time when the securities markets did not so readily facilitate the decoupling of share ownership from an underlying economic interest. Indeed, prior Delaware case law understands the purpose of the continuous ownership rule precisely to be the requirement that the plaintiff maintain a continuous economic interest in the litigation, in the sense that its continued ownership of shares ensures that the plaintiff would benefit if the derivative suit resulted in redress to the corporation.[105] A good example of this understanding is set forth in the Supreme Court's decision in *Alabama By–Products Corp. v. Cede & Co.*, which states:

> [A] shareholder is permitted to intrude upon the authority of the board by means of a derivative suit only because his status as a shareholder provides an interest and incentive to obtain legal redress for the benefit of the corporation. Once the derivative plaintiff ceases to be a stockholder in the corporation on whose behalf the suit was brought, *he no longer has a financial interest in any recovery pursued for the benefit of the corporation* .... [B]ecause a plaintiff may lose his incentive to prosecute a suit by being divested of the property interest (shares of stock) in the corporation for whose behalf he acts, the deriva-

---

103. *See* Paris Aff. Ex. 100.

104. *See, e.g., Bakerman v. Sidney Frank Imp. Co.*, 2006 WL 3927242, at *11 (Del.Ch. Oct. 10, 2006) (outlining considerations relevant to whether a plaintiff is adequate to maintain a derivative suit).

105. For this reason, Delaware courts have never focused on record ownership in determining whether a derivative plaintiff had standing. Rather, the court has looked to beneficial ownership as the test. *See, e.g., Rosenthal v. Burry Biscuit Corp.*, 60 A.2d 106, 111–2 (1948) (allowing an equitable owner to pursue a derivative action).

tive suit requires "continued as well as original standing."[106]

■ Because of the important policy purpose served by the continuous ownership rule, the rule is a bedrock tenet of Delaware law and is adhered to closely.[107] Where, as here, a derivative plaintiff has become an "empty plaintiff,"[108] form (i.e., ownership of shares) does not trump substance (i.e., lack of any economic interest whatsoever in the recovery pursued for the corporation),[109] and the clear policy purpose served by the traditional application of the continuous ownership rule is implicated.[110] Whatever right exists to bring a derivative action derives its origin from our common, not statutory, corporate law,[111] and given that reality, I have no hesitance in holding that a derivative plaintiff who empties itself of any interest in the underlying litigation loses standing.

■ Although it is too often overlooked, derivative suits are a form of representative action. Indeed, they should be seen for what they are, a form of class action. Representative actions raise legitimate concerns about the extent of alignment between the interests of the named plaintiffs and of those who the named

**106.** *Alabama By–Products Corp. v. Cede & Co.*, 657 A.2d 254, 265–66 (Del.1995) (emphasis added) (citing *Anderson*, 477 A.2d at 1047); *see also Schilling v. Belcher*, 582 F.2d 995, 1002 (5th Cir.1978) ("Standing is justified only by this proprietary interest created by the stockholder relationship *and the possible indirect benefits the nominal plaintiff may acquire qua stockholder of the corporation which is the real party in interest.*") (emphasis added) (quoting *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 735–36 (3d Cir.1970), *cert. denied*, 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971)); *Portnoy v. Kawecki Berylco Indus., Inc.*, 607 F.2d 765, 767 (7th Cir.1979) ("[B]ecause a shareholder will receive at least an indirect benefit ... from any corporate recovery, he has an adequate interest in vigorously litigating the claim. A non-shareholder or one who loses his shareholder interest during the course of litigation may lose any incentive to pursue the litigation adequately.").

**107.** *See, e.g., In re New Valley Corp. Deriv. Litig.*, 2004 WL 1700530, at \*3 (Del.Ch. June 28, 2004); *Ash v. McCall*, 2000 WL 1370341, at \*12 (Del.Ch. Sept. 15, 2000) (referring to *"Lewis v. Anderson's* apparently iron-clad rule").

**108.** I borrow this phrase from an important article, Henry T.C. Hu & Bernard Black, *Empty Voting and Hidden (Morphable) Ownership: Taxonomy, Implications, and Reforms*, 61 Bus. Law. 1011, 1014 (2006), which, along with another important article, Shaun Martin & Frank Partnoy, *Encumbered Shares*, 2005 U. Ill. L.Rev. 775, drew attention to the problem of "empty voting" of corporate shares;

that is, the voting of corporate shares by persons who lacked any economic interest in the corporation or, even worse, stood to gain if the corporation lost. *See also* Henry T.C. Hu & Bernard Black, *The New Vote Buying: Empty Voting and Hidden (Morphable) Ownership*, S. Cal. L.Rev. 811 (2006); Henry T.C. Hu & Bernard Black, *Equity and Debt Decoupling and Empty Voting II: Importance and Extensions*, 156 U. Pa. L.Rev. 625 (2008).

**109.** *Gatz v. Ponsoldt*, 925 A.2d 1265, 1280 (Del.2007) ("It is the very nature of equity to look beyond form to the substance of an arrangement. 'Equity will not permit one to evade the law by dressing what is prohibited in substance in the form of that which is permissible.'") (quoting *Kelley v. Mayor and Council of City of Dover*, 300 A.2d 31, 38 (Del.Ch.1972)) (footnote omitted). To be sure, there is case law suggesting no economic interest is required to have standing in Section 220 DGCL proceedings. *Macklowe v. Planet Hollywood, Inc.*, 1994 WL 560804, at \*3 (Del.Ch. Sept. 29, 1994); *see also, Martin, supra* note 108 at 778–779, 788.

**110.** *See Braasch v. Goldschmidt*, 199 A.2d 760, 765–6 (Del.Ch.1964) (ruling that plaintiffs who are no longer stockholders cannot maintain a derivative action).

**111.** *Schoon v. Smith*, 953 A.2d 196, 2008 WL 375826, at \*3 (Del. Feb. 12, 2008) (referring to derivative actions as 'a creature of equity') (quoting William Meade Fletcher, Cyclopedia of the Law of Corporations § 5980 (2004)).

plaintiffs purport to represent.[112] One can confidently say that adhering to a minimum requirement that the named plaintiffs in a derivative action retain an actual economic interest in the litigation will not be an obstacle to useful derivative suits. Rather, it is at most a non-stringent requirement necessary to ensure the most minimal alignment between the interests of the plaintiff and the corporation whose interests he supposedly seeks to vindicate.[113]

Once Parfi divested itself of its economic interest in this litigation, it lost standing to press this derivative case permanently.[114] By definition, it cannot rectify an interregnum when a continuity of interest is required.[115] Interestingly, the interest that

112. *See, e.g.,* John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation,* 100 Colum. L.Rev. 370, 375 (2000) ("The initial problem is that there are many decisions in life over which most individuals would not wish to cede authority to an unchosen agent to act on their behalf—at least not simply because that person bore surface similarities with them and had no discernible conflict of interest. The deeper problem lies, however, in the fact that even an entirely unconflicted representative whose characteristics correspond in every way with their own might still be an ineffective agent."); John Leubsdorf, *Co-Opting the Class Action,* 80 Cornell L.Rev. 1222 (1995).

113. I recognize that in the context of Section 220, this court has refused to look behind record ownership to determine whether a stockholder had a net long interest in the corporation. *See Deephaven Risk Arb Trading Ltd. v. UnitedGlobalCom, Inc.,* 2005 WL 1713067, at *5–6 (Del.Ch. July 13, 2005). Section 220 cases present a different context in part because § 220 creates a statutory right to books and records that is not qualified by a requirement that the owner actually have an economic interest in the firm's success. Derivative actions are a creature of common law, not statute. *E.g., Schoon,* 953 A.2d 196, 2008 WL 375826, at *3. Most important, unless one perceives the continuous ownership rule to lack any substantive context, it would make no policy sense for this court to ignore the reality of an empty plaintiff, whose trading activity has emptied himself of any interest in the outcome of the lawsuit. As a matter of our common law, it is more sensible to uphold the long-understood policy purpose behind the continuous ownership rule.

114. *See New Valley,* 2004 WL 1700530, at *3– 4:

Essentially, [Goodwin] argues that his *subsequent purchase* of stock bookends a short time span of not holding stock punctuating continuous ownership by a long-term investor. *To allow the subsequent purchase to complete the story, however, would essentially allow Goodwin to 'buy back' into the litigation. Such an action, even though by a formerly long-term stockholder as opposed to a new investor, is exactly the type of action the continuous ownership requirement is designed to prevent.* Just as Goodwin could not have bought his way into a derivative suit at its outset, so too can he not buy his way back into such a suit after losing his standing. Goodwin has stated that he 'did not realize that [his] sale of New Valley stock while still retaining New Valley warrants might affect [his] standing as a plaintiff in this case.' The continuous ownership requirement, however, has been held applicable even in situations where individuals' stock ownership has been *involuntarily* terminated in, for example, cash-out mergers. Here, Goodwin *voluntarily* sold his shares. Again, . . . once he did so, he lost standing to pursue this derivative litigation as lead plaintiff.

(footnotes omitted, second emphasis added).

115. Moreover, repurchases implicate the purpose long understood to be served by the contemporaneous ownership rule. *Rosenthal v. Burry Biscuit Corporation,* 60 A.2d at 111 (the contemporaneous ownership rule "was enacted in Delaware to prevent what has been considered an evil, namely, the purchasing of shares in order to maintain a derivative action designed to attack a transaction which occurred prior to the purchase of the stock."). Admittedly, some have rationally questioned the continuing utility of that rule, especially in circumstances when a subsequent purchaser had no knowledge of a wrong that arose before his purchase and seeks redress for the corporation when becoming aware of that

Parfi bought back appears to bear no relation to its proportionate ownership interest in Mirror Image, and only to be based on some percentage ownership in the litigation rights market comprised by the Consortium.

### C. Inadequacy As Derivative Plaintiffs

Lastly, the defendants claim that Plenteous and Parfi do not qualify as adequate derivative plaintiffs, as mandated by Chancery Rule 23.1, based on several grounds that are contested by Plenteous and Parfi.

 Pursuing a derivative claim requires more than ownership. A plaintiff must also "satisfy the adequacy requirements implicit in Court of Chancery Rule 23.1."[116] A "derivative plaintiff serves in a fiduciary capacity as representative of persons whose interests are in plaintiff's hands and the redress of whose injuries is dependent upon her diligence, wisdom, and integrity."[117]

 Having already determined that the plaintiffs misled this court about material events for tactical advantage, I cannot conclude that they are adequate to serve in the fiduciary capacity of a derivative plaintiff. Moreover, in a prior decision, this court pointed to prior instances when the plaintiffs had been less than straightforward with this court.[118] Furthermore, the plaintiffs have spent a material amount of this litigation in stasis because they were not paying their initial counsel or feuding with and refusing to assent to the withdrawal of the second set of lawyers. And the one remaining named plaintiff who actually owns shares has a trifling economic interest in the outcome of the case. Given this overall record, and especially the conduct addressed earlier in this decision, the plaintiffs are not, in my view, appropriate derivative plaintiffs.

Lastly in this regard, it has emerged that the authority of counsel for the plaintiffs to proceed on Parfi's behalf is uncertain. Parfi is now bankrupt, and its only assets consist of its three shares of Mirror Image and a 1% interest in this litigation. At oral argument, it was suggested that the trustee in bankruptcy had tried to sell Parfi's shares to the defendants. Even more important, it was not clear that the board of Parfi had actually authorized counsel to proceed on Parfi's behalf. If this case were to proceed with Parfi as a plaintiff, proof that Parfi's duly authorized governing body desired to move forward would have to be provided.

### V. Application For Attorneys' Fees

In September 2005, I granted the defendants' motion to compel and awarded reasonable fees to the defendants for preparing "the Motion, supporting memorandum of law and reply in further support of the Motion," to be paid by Plenteous, Parfi and Gillberg.[119] But, I expressly limited the award to this discrete aspect of the litigation and did not find that an award of the defendants' total litigation expenses to be warranted.[120]

---

wrong. *See* J. Travis Laster, *Goodbye to the Contemporaneous Ownership Requirement*, Del. Law., Spring 2008, at 25. But the rule remains in place.

**116.** *Bakerman v. Sidney Frank Importing Co.*, 2006 WL 3927242, at *10 (Del.Ch. Oct. 10, 2006).

**117.** *In re Fuqua Indus., Inc. S'holder Litig.*, 752 A.2d 126, 129 (Del.Ch.1999) (citing *Katz v. Plant Indus., Inc.*, 1981 WL 15148 (Del.Ch. Oct.27, 1981)) (emphasis added).

**118.** *Parfi III*, 842 A.2d at 1258.

**119.** *See* Order of October 30, 2005.

**120.** *See* 09/12/05 Tr. at 79–80 ("It's just preparing the motion. Doesn't mean the entire litigation. So before anybody has a panic attack and—and I don't want the—the defen-

The defendants seek a net amount of $50,957.50, having been paid about 27% of the total amount of their fees, some $18,753.50, by former plaintiff Gillberg in connection with his voluntary dismissal. The defendants calculated their total fees to be $69,711.00 by aggregating all of the attorneys' fees and expenses incurred in relation to the motion to compel; in total, this involved five attorneys,[121] and 165.3 hours to prepare fewer than 30 pages of briefing. The defendants assert that this is reasonable "given the somewhat unusual posture of the case at that time, and the generally intransigent position taken by the remaining plaintiffs with respect to discovery at that time," due to which the motion to compel "required substantial research and consideration."[122] The defendants have submitted copies of the relevant portions of the bills submitted to Xcelera in connection with the motion to compel. In their calculation, time entries relating to other activities on the matter have been excluded from the time spent on the motion to compel, based on estimates using the attorneys' time entries and recollections.[123]

The plaintiffs contest the fee amount sought by the defendants and ask that "the Court reduce Defendants' attorneys' fees to an amount not in access of $15,000 or an amount the Court determines is reasonable in light of tasks at issue and work performed."[124] The plaintiffs did not do much to support their argument other than to note that their own lawyers expended far less time in addressing the motion to compel than did the defendants and that the issues on the motion to compel were not, in the plaintiffs' view, complex.

 In determining what fees to award in connection with a discovery sanction, this court has the discretion to examine the circumstances and determine what fees are reasonable.[125] After considering the relevant factors,[126] I conclude that the defendants are entitled to less than all of the fees and expenses they seek. I do not

dants to lard this up. They're relatively focused papers.").

**121.** The defendants were represented by four attorneys (two partners, of whom one replaced the other at oral argument, one counsel and one associate) from Wilmer Cutler Pickering Hale & Dorr LLP and one lawyer (a director) from Richards, Layton & Finger P.A.

**122.** Macdonald Aff. at 4.

**123.** *Id.* at 4–5.

**124.** Pls.' Opp'n. Br. at 54.

**125.** *See Johnston v. Arbitrium (Cayman Islands) Handels,* 720 A.2d 542, 547 (Del.1998).

**126.** In a recent decision, the Supreme Court has suggested that this court should consult Rule 1.5(a) of the Delaware Lawyers' Rules of Professional Conduct in addressing the reasonableness of a request for attorneys fees, even when the matter is not a dispute between a client and counsel. *Mahani v. Edix Media Group, Inc.,* 935 A.2d 242, 243 (Del. 2007). The Rule 1.5(a) factors are: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal services properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent. In this case, the relevant factor is really the first. There is no basis to challenge the professional competence of defense counsel or the reasonableness of their rates, and their efforts were successful. The sole issue is whether the amount of time expended was disproportionate to the tasks involved.

base that reduction on any problem with defense counsel's rates, or the hours spent by Delaware counsel reviewing and commenting on the motion to compel briefs for the defendants. Rather, I conclude that a material reduction is required because an excessive number of hours were spent by the defendants' New York counsel in crafting the briefs in support of the motion to compel brief. Although the motion to compel involved important issues in this case, which counsel addressed in a professional and effective manner, the 165 hours expended were disproportionate to what it should have taken to write the two briefs in question.[127] Much of the excess expense here appears to have resulted from a sad personal situation faced by a senior lawyer on the case, who had to step aside for a time, but that extra expense should not be borne by the plaintiffs. What apparently happened was that a senior attorney unfamiliar with the file spent a lot of time getting up to speed on the case generally, resulting in an excess number of hours to produce the specific work product at issue.

Unlike the plaintiffs, however, I do not think the defendants deserve to be left looking like a 21st century Johnny Unitas. Rather, a more modest trim is in order, especially given the reality that it was the plaintiffs' unjustified refusal to produce relevant discovery that necessitated the motion to compel in the first place. Therefore, I reduce the requested fees to approximately 75% of the total sought. Giving the remaining plaintiffs credit for the $18,753.50 paid by Gillberg, I find them responsible for paying $33,529.75 to the defendants.

## VI. *Conclusion*

For the foregoing reasons: 1) the defendants' motion under Rule 41(b), and in reliance on the inherent authority of the court to address misconduct in the litigation process, to dismiss the plaintiffs' claims with prejudice is GRANTED; 2) in the alternative, the defendants' motion to dismiss the derivative counts of the complaint because Plenteous and Parfi lack standing and are inadequate derivative plaintiffs is GRANTED; and 3) Plenteous and Parfi shall pay to the defendants the sum of $33,529.75 in fees and expenses within 30 days of the date of this opinion. Finally, in view of the rulings on the defendants' motion, there is no basis to disturb the Stay Order and the plaintiffs' motion to lift the Stay Order is DENIED. The defendants shall submit a conforming order, upon notice as to form, within five days.

---

127. *See Richmont Capital Partners I, LP. v. J.R. Investments Corp.*, 2004 WL 1152295, at *3 (Del.Ch. May 20, 2004) (when determining what fee is reasonable to award, courts "generally exclude excessive, redundant, duplicative or otherwise unnecessary hours.").