# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JONATHAN GOVETTE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2019-0139-SG |
| | ) | |
| ELECTRONIC REFERRAL | ) | |
| MANAGER, INC., DAVID | ) | |
| BONGIOVANI, RICK HAMMER, AND | ) | |
| JOSEPH MACALUSO, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: January 26, 2021
Date Decided: June 7, 2021

Jonathan Govette, *Pro Se.*

Paul Brown, of CHIPMAN BROWN CICERO & COLE, LLP, Wilmington, Delaware; OF COUNSEL: Hank Burgoyne, of BURGOYNE LAW GROUP, San Francisco, California, *Attorneys for Defendants*.

GLASSCOCK, **Vice Chancellor**

In Delaware, the right to proceed *pro se* in criminal matters is constitutional.[1] I can find no corresponding constitutional or statutory right regarding civil self-representation. However, competent natural persons in Delaware have a right to self-represent in civil matters as well.[2] This right is protected by our common law, apparently as adjunct to a right of access to justice;[3] the right extends to equitable proceedings. *Pro se* litigation appears to be a relatively modern phenomenon in Chancery, however; most of the early cases I reviewed involved court appointed receivers and the like appearing *pro se*, and not independent parties.[4] The first example I can locate involving a corporate dispute with a true *pro se* litigant was the 1957 case *In re North European Oil Corporation*.[5]

---

[1] Del. Const. Art. I §7 (1897).

[2] *See, e. g.*, *Green v. Cty. Council*, 508 A.2d 882 (Del. Ch. 1986) (describing right to proceed *pro se* in Chancery, without identifying the source of the right); *Pullin v. Davis*, 2016 WL 4679246 at *1 (Del. Ch. Sept. 7, 2016) (same). Non-natural juridical persons—trusts, corporations, etc.— have limited or no right to representation by an agent *pro se*. *See, e.g.*, *Weber v. Kirchner*, 2003 WL 23190392, at *1 (Del. Ch. Dec. 31, 2003) (citing *Transpolymer Indus., Inc. v. Chapel Mail Corp.*, 582 A.2d 936 (Del. 1990)).

[3] This conflation of access with self-representation is interestingly criticized by Rabeea Assy in *Revisiting the Right to Self-Representation in Civil Proceedings*, Oxford Student Legal Research Paper Series 2/2012.

[4] *E.g.*, *Veeder v. Public Service Holding Co.* 51 A2d. 321 (Del. Ch. 1947).

[5] 129 A.2d 259 (Del. Ch. 1957). The *pro se* party there contended with such giants of the Delaware bar as Alexander Nichols and Edmund Carpenter. *See generally id.* There were undoubtedly many other *pro se* cases in the jurisdiction of the Orphans Court, later assumed by Chancery.

1

Whatever its contribution to access to justice, *pro se* litigation in this Court tends to impose extra costs on society and the other litigants,[6] and decreases the opportunity for success of the self-represented litigant as well. In my experience at least, *pro se* cases of a particular nature are on the rise in this Court: cases involving corporate and entity law that also appear to involve self-representation by choice, rather than circumstance.[7] I cite a few such cases from my docket in recent years illustrative of one or both criteria, below.[8] Such cases themselves are counter to the preconception of a feisty but poor *pro se* litigant gamely standing up for her rights.

Delaware judges traditionally (and naturally) treat self-represented individuals with some degree of latitude when it comes to procedure in order to do

---

[6] Assy, *supra* note 3, at 19 (quoting Drew A. Swank, *In Defense of Rules and Roles: The Need to Curb Extreme Forms of* Pro Se *Assistance and Accommodation in Litigation* 54 Am. U. L. Rev. 1537, 1547 n.3 (2005)).

[7] The Plaintiff in this corporate dispute, I note, is proceeding *in forma pauperis.*

[8] *See, e.g., Wollard v. Yoder & Sons Constr., LLC*, 2021 WL 141984 (Del. Ch. Jan. 15, 2021); *Villette v. MondoBrain, Inc.*, 2020 WL 7706961 (Del. Ch. Dec. 29, 2020); *Stimwave Techs. Inc. v. Perryman*, 2020 WL 6735700 (Del. Ch. Nov. 17, 2020) (dismissing certain *pro se* individual defendants, who later elected to file a separate action); *In re Swisher Hygiene, Inc.*, 2020 WL 5268067 (Del. Ch. Sept. 4, 2020); *Zachman v. Real Time Cloud Services, LLC*, 2020 WL 1522840 (Del. Ch. March 31, 2020); *Henlopen Landing Homeowners Ass'n, Inc. v. Vester*, 2019 WL 3484254 (Del. Ch. Aug. 1, 2019); *Pullin v. Davis*, 2016 WL 4679246 (Del. Ch. Sept. 7, 2016); *Lechliter v. Delaware Dep't of Nat. Res.*, 2016 WL 878121 (Del. Ch. Mar. 8, 2016); *Greenspan v. News Corp.*, 2016 WL 279944 (Del Ch. Jan. 22, 2016); *Alfred v. Walt Disney Co.*, 2015 WL 177434 (Del. Ch. Jan. 14, 2015); *GMF ELCM Fund L.P. v. ELCM HCRE GP LLC.*, 2019 WL 3713844 (Del. Ch. Aug. 7, 2019); *c.f.* Benjamin Lord's Br. in Supp. of Cross-Mot. to Allow, *GMF ELCM Fund L.P. v. ELCM HCRE GP LLC*, C.A. No. 2018-0840, Dkt. No. 386 (March 4, 2021); *see also Durham v. Grapetree, LLC*, 246 A.3d 566 (Del. 2021); Special Master's Report, *Durham v. Grapetree, LLC*, C.A. No. 2019-0366-SG, Dkt. No. 68 (Jan. 19, 2021); *Durham v. Grapetree, LLC*, 2021 WL 82338 (Del. Ch. Jan. 11, 2021); *Durham v. Grapetree, LLC*, 2020 WL 5960941 (Del. Ch. Oct. 8, 2020), aff'd, 246 A.3d 566 (Del. 2021); *Durham v. Grapetree, LLC*, 2014 WL 3565980 (Del. Ch. July 21, 2014); *Durham v. Grapetree, LLC*, 2013 WL 3817465 (Del. Ch. July 23, 2013).

justice on the merits.[9]  Conversely, we also encounter situations when the cost of a party's *pro se* status begins to be imposed on the party opponent in a material way. When such a party opponent to a *pro se* litigant seeks relief, a balancing of these interests results, within the judge's discretion.  Such balances are often described by jurists in terms of allowing a "certain leeway" for the *pro se*,[10] but not a "blank check" for failure to comply with rules and procedures;[11] language that is no doubt descriptive of the process but unhelpful as a template.  One such situation is before me here.

This matter involves the Defendants' Motion to Dismiss the Second Amended Verified Complaint.  The Plaintiff has been at times represented by counsel in this litigation, which involves a contested issuance of equity in a Delaware corporation. The Plaintiff is now *pro se*.  The Motion to Dismiss turns in part on failure to properly prosecute this action.  For the reasons that follow, the Motion is denied.

---

[9] *See, e.g.*, *Sloan v. Segal*, 2008 WL 81513, at *7 (Del. Ch. Jan. 3, 2008) ("An analysis of the leniency granted to *pro se* litigants in other situations suggests that Delaware courts, at their discretion, look to the underlying substance of a *pro se* litigant's filings rather than rejecting filings for formal defects and hold those *pro se* filings to 'a somewhat less stringent technical standard' than those drafted by lawyers." (citations omitted)).

[10] *Beck v. Greim*, 2016 WL 3962053, at *2 (Del. Ch. July 22, 2016) (quoting *Taglialatela v. Galvin*, 2016 WL 3752185, at * 3 (Del. Ch. July. 8, 2016)).

[11] *See, e.g.*, *Sloan v. Segal*, 2008 WL 81513, at *7 (quoting *Quereguan v. New Castle Cnty.*, 2006 WL 2925411, at *4 (Del. Ch. 2006)).

# I. BACKGROUND[12]

The Plaintiff founded Electronic Referral Manager, Inc. ("ERM" or the "Company") in 2011 as the sole director and Chief Executive Officer ("CEO"), an arrangement that continued until 2018.[13] In 2012, the Plaintiff and ERM executed a Common Stock Purchase Agreement.[14] Pursuant to the Agreement, the Company, acting through the Plaintiff, purported to sell the Plaintiff 5,000,000 of the Company's 10,000,000 authorized shares (the "Contested Shares") in exchange for $20,000.[15] In connection with the Agreement, the Plaintiff also executed and conveyed to the Company an "Acknowledgment of Cancellation of Indebtedness," by which he purported to cancel $20,000 of debt owed to him by the Company as payment for the Contested Shares.[16] As sole director, he also executed a written consent on behalf of the Company permitting payment in the above described manner and filed a notice pursuant to California law reporting the transaction.[17] The

---

[12] Unless otherwise noted, the facts in this Background section are drawn from the Plaintiff's Second Amended Verified Complaint (the "Operative Complaint") for context and do not constitute factual findings by the Court. *See generally* Second Am. Verified Compl. for Summ. Proceeding, Dkt. No. 30 [hereinafter Second Am. Compl.].

[13] *See id*. ¶¶ 10, 17. He was also ERM's sole employee. *Id*. ¶¶ 11.

[14] *Id*. ¶ 14.

[15] *Id.*

[16] *Id*. ¶¶ 13, 16. It is unclear what the Plaintiff alleges that he actually paid for the shares. He has asserted at various times that he paid cash, deposited a check, deferred compensation, and/or cancelled a debt owed to him by ERM in exchange. *See, e.g., id.* Part of the challenge in recreating the Plaintiff's contributions to ERM is caused by the Plaintiff's alleged practice of paying the Company's expenses through a bank account that he also used for his consulting business. *See, e.g., id.* ¶ 12.

[17] *See id.* ¶¶ 13, 19.

4

Plaintiff also submits that he paid for his shares in other ways—by working without a salary or via a combination of several deposits into the Company's accounts and purchases made on its behalf.[18] In previous pleadings, the Plaintiff alleged other potential methods of payment, including a $25,000 check from his uncle.[19] Regardless of how they were paid for, the Plaintiff's purported ownership of the Contested Shares went unchallenged until August 2018, when defendants Bongiovanni and Hammer joined the board.[20] Within the month, the Plaintiff, allegedly under pressure from Bongiovanni and Hammer, resigned as CEO[21] and was purportedly removed from the Company's board of directors.[22] Bongiovanni and Hammer, now acting as the sole board members, also voted to rescind the Stock Purchase Agreement and cancel the Plaintiff's shares.[23] The Plaintiff initiated this action under 8 *Del. C.* §§ 205 and 225 to confirm his ownership of the Contested Shares and invalidate his removal from the board of directors.

The Plaintiff filed his first complaint on February 21, 2019.[24] The Defendants answered this "Initial Complaint" on March 20, 2019.[25] I granted the parties'

---

[18] *See generally, e.g.*, Pl.'s Ltr. Answer, Dkt. No. 45 (although the Plaintiff labeled this filing an "Answer," I treat it as a brief in opposition to the Defendants' Motion to Dismiss the Second Amended Complaint).

[19] *See* First Am. Compl. ¶ 13, Dkt. No. 24.

[20] Second Am. Compl. ¶ 25.

[21] *Id.* ¶ 26–27.

[22] *Id.* ¶ 33. He was ultimately fired as well. *Id.* ¶ 35.

[23] *Id.* ¶ 30.

[24] Verified Compl. for Summ. Proceeding, Dkt No. 1.

[25] Defs.' First Answer, Dkt. No. 12.

stipulated status quo order on March 21, 2019, which required advance notice to the Plaintiff and this Court before the Defendants take or cause the Company to take any "material action out of the ordinary course of business."[26]

The Plaintiff amended the Initial Complaint on July 31, 2019 (the "First Amended Complaint").[27] The Defendants answered on August 21, 2019.[28] The Plaintiff amended his complaint a second time on September 16, 2019 but neglected to include the required verification.[29] Shortly after filing the Second Amended Verified Complaint (the "Operative Complaint"), Plaintiff's Counsel moved to withdraw representation, citing irreconcilable differences.[30] At a teleconference on Plaintiff's Counsel's Motion, the Court instructed Plaintiff's Counsel to advise the Plaintiff of upcoming court deadlines.[31] On October 24, 2019, Counsel docketed a letter to the Plaintiff informing him that a letter explaining why the Status Quo Order should be maintained was due to the Court by October 31.[32] By this time, the Director Defendants had also moved to dismiss or strike the Operative Complaint.[33]

---

[26] Status Quo Order ¶ 2, Dkt. No. 14.
[27] First Am. Compl., Dkt. No. 24.
[28] Defs.' Second Answer, Dkt. No. 29.
[29] *See* Second Am. Compl., Dkt. No 30 (missing verification).
[30] *See* Mot. to Withdraw, Dkt. No. 32.
[31] Judicial Action Form, Dkt. No. 37.
[32] *See* Ltr. to Jonathan Govette, Dkt. No. 36.
[33] *See* Mot. to Dismiss, Dkt. No. 33.

The Court, through Plaintiff's Counsel's letter, also requested a response to the Motion to Dismiss by November 13, 2019.[34]

The Plaintiff submitted a letter on October 29, 2019 that indicated he would continue to litigate this matter on his own behalf.[35]  The letter requested that the Status Quo Order remain in place "to protect the company against [Bongiovanni] selling it to the lowest bidder, or his friends," but did not noticeably respond to the Motion to Dismiss.[36]  After the Court granted Plaintiff's Counsel's Motion to Withdraw, the Plaintiff was granted leave to proceed *in forma pauperis*.[37]  The Plaintiff did not respond further to the Motion to Dismiss by the due date,  November 13.  The Defendants submitted a Reply in further support of their Motion to Dismiss on December 12, 2019.[38]  Because it was not readily apparent that the Plaintiff's letter of October 29, 2019 opposed the Motion to Dismiss, and in consideration of the Plaintiff's newly *pro se* status, I granted the Plaintiff an extension until February 28, 2020 to submit a response.[39]  The Plaintiff responded on February 27, 2020.[40] In lieu of oral argument on the outstanding motion, I requested the parties facilitate a decision on a paper record by providing supplemental submissions as to what

---

[34] *See* Ltr. to Jonathan Govette, Dkt. No. 36.
[35] *See* Ltr. from Jonathan Govette, Dkt. No. 38.
[36] *See id.* 8.  The letter also offered new factual allegations, particularly against defendant Bongiovanni, that I do not address further here.
[37] *See* Order on Appl. to Proceed *In Forma Pauperis*, Dkt. No. 41.
[38] Defs.' Reply Br., Dkt. No. 42.
[39] *See* Ltr. to Mr. Govette, Dkt. No. 44.
[40] *See* Pl.'s Ltr. Answer, Dkt. No. 45.

issues remained to be decided.[41]  The Defendants timely submitted their letter on October 12, 2020.[42]  Although I had instructed the Plaintiff, via teleconference, that he would have one week to respond to the Defendants' submission, he did not respond until November 2, 2020.[43]

In my Letter Opinion of December 8, 2020, I granted the Defendants' Motion to Strike the Plaintiff's Second Amended Verified Complaint and instructed the Plaintiff to file a properly verified pleading with the Court by December 22, 2020, at which time I would consider the Motion to Dismiss submitted.[44]  The Plaintiff timely submitted the requested verification on December 17, 2020.[45]  I requested by email that the Defendants file any response by January 22, 2021, which they did on January 21, 2021.[46]  I accordingly consider the Motion to Dismiss and the request to vacate the Status Quo Order fully submitted as of January 21, 2021 on the record as it existed on October 27, 2020.[47]

---

[41] *See* Judicial Action Form, Dkt. No. 54.
[42] *See* Ltr. from Paul D. Brown, Dkt. No. 55.
[43] *See* Faxed Ltr. from Jonathan Govette, Dkt. No. 58.  Although the Plaintiff's letter wasn't posted to the docket until November 9, it had previously been emailed to the Court on November 2.  The Defendants requested that I reject the Plaintiff's letter as untimely and noncompliant.  *See* Ltr. from Paul D. Brown Responding to Pl.'s Nov. 2, 2020 Submission to the Court, Dkt. No. 57.
[44] Ltr. Op., Dkt. No. 60.
[45] *See* Verification to Second Am. Compl., Dkt. No. 61.
[46] *See* Ltr. to the Honorable Sam Glasscock, III from Paul D. Brown, Esquire, Dkt. No. 62.
[47] In my previous Letter Opinion, I noted that the Plaintiff's filings of November 2 and November 12, 2020 were untimely and would not be considered further.  Ltr. Op. 3, Dkt. No. 60.

**II. ANALYSIS**

*A. The Motion to Dismiss*

The Defendants have moved to dismiss the Plaintiff's Second Amended Complaint under a combination of Court of Chancery Rules 3(aa) and 41(b). Under Rule 41(b), a defendant may move for dismissal "[f]or failure of the plaintiff to prosecute or to comply with these Rules or any order of court."[48] Rule 3(aa) requires that "[a]ll complaints . . . and any amendments thereto, shall be verified by each of the parties filing such pleading."[49] Thus, "if a plaintiff fails to comply with Rule 3(aa), Rule 41(b) permits the defendant to move for dismissal of the action."[50] Dismissal on this basis is considered a "harsh sanction" and is proper "when a party knowingly misleads a court of equity in order to secure an unfair tactical advantage."[51] At the pleading stage, such a dismissal is particularly rare.[52]

As grounds for the Motion, the Defendants point to purportedly false allegations in the Plaintiff's prior pleadings and the Plaintiff's failure to follow Court rules. They submit that the Plaintiff, in his Initial Complaint, falsely alleged that

---

[48] Ct. Ch. R. 41(b).

[49] Ct. Ch. R. 3(aa).

[50] *Bessenyei v. Vermillion, Inc.*, 2012 WL 5830214, at *2 (Del. Ch. Nov. 16, 2012) (quoting *Parfi Holdings AB v. Mirror Image Internet, Inc.*, 954 A.2d 911, 932–33 (Del. Ch. 2008)), *aff'd,* 67 A.3d 1022 (Del. 2013).

[51] *Parfi Holdings AB v. Mirror Image Internet, Inc.*, 954 A.2d 911 (Del. Ch.2008); *see also Gross v. Biogen Inc.*, 2021 WL 1399282, at *5 (Del. Ch. Apr. 14, 2021).

[52] *See, e.g., Charter Commc'ns Operating, LLC v. Optymyze, LLC*, 2021 WL 1811627, at *24 (Del. Ch. Jan. 4, 2021).

they coerced him into naming them to the Board in August 2018. Per the Defendants, the Plaintiff, acknowledging the weakness and falsity of the Initial Complaint, then withdrew it in favor of the First Amended Complaint, which contained additional false allegations. The First Amended Complaint attached documents purporting to be "two slightly different versions of minutes" of a July 18, 2012 meeting of ERM's board of directors at which the Plaintiff allegedly approved his own purchase of the Contested Shares on the Company's behalf (the "July 18 Minutes").[53] The Defendants submitted an expert report contending that the July 18 Minutes had been falsified.[54] They deem the Plaintiff's choice to amend the First Amended Complaint—removing the July 18 Minutes—"yet another tacit admission of falsity."[55] They also note that the Operative Complaint did not comply with rule 3(aa) because it was not verified when filed. In subsequent letter submissions, the Defendants also aver that this case "has not been prosecuted in a summary fashion—in part due to multiple iterations of [the Plaintiff's] complaint and the eventual withdrawal of his counsel."[56] They profess that they "have been forced to parry an ever-morphing complaint"[57] and urge me to find that the Plaintiff's "ever-shifting

---

[53] *See* First Am. Compl. ¶ 13.
[54] *See* Defs.' Opening Br., Ex. B 4–5. The report concluded that the July 18 Minutes may have been falsified. *Id.* The Defendants also cite the Plaintiff's deposition, in which the Plaintiff could not say whether he prepared them before, during, or after the alleged meeting. *See* Defs.' Opening Br. 15–16.
[55] Defs.' Opening Br. 11.
[56] *See* Ltr. re Court's Ltr. of August 28, 2020 at 1, Dkt. No. 53.
[57] Ltr. re Pending Mot., Dkt. No. 43.

theories and allegations . . . lack veracity or are suspicious enough to warrant discretionary dismissal under the combination of Court of Chancery Rules 3(aa) and 41(b)."[58]

The Plaintiff's responses to the Motion, which are confusingly spread out over multiple letter submissions, describe his service to the Company, the many ways he paid for his shares, and how he was forced out by the Defendants, including numerous factual allegations that do not appear in the Operative Complaint.[59] These submissions are not always obviously responsive to the outstanding Motion to Dismiss. I can, however, state with certainty that the Plaintiff opposes the Motion and requests that the Status Quo Order remain in place.

To support their Motion, the Defendants cite *Bessenyei v. Vermillion, Inc.*[60] In *Bessenyei*, Vice Chancellor Noble granted a motion to dismiss based on Court of Chancery Rules 3(aa) and 41(b), after finding that verifications to multiple filings in the case were improperly notarized.[61] Three separate verifications (to the initial complaint, the amended complaint, and a response to interrogatories) had been notarized in Pennsylvania despite discovery revealing that one of the plaintiffs had

---

[58] Ltr. re Issues to Resolve on Paper Record 3, Dkt. No. 55.
[59] *E.g.*, Ltr. from Jonathan Govette, Dkt No. 38. The Defendants, I note, respond to the Plaintiff's additional arguments with their own contentions as to his purported mismanagement of the Company. I do not consider either parties' conduct outside of this litigation to be properly before me for purposes of this Motion to Dismiss. Accordingly, I do not address those arguments here.
[60] 2012 WL 5830214 (Del. Ch. Nov. 16, 2012).
[61] *See generally id.*

not been in the United States on those dates.[62] Under Pennsylvania law, "[the plaintiff's] failure to appear before [the notary] at the time the notarizations took place render[ed] the notarizations invalid."[63] The Vice Chancellor found that the verifications were thus invalid for purposes of Rule 3(aa) and, further, that the failure to have the documents properly notarized was "not incidental or technical," and dismissed the case under Rule 41(b).[64]

The Defendants argue that *Bessenyei* supports dismissal here; I disagree. First, the Defendants ask me to find that the Plaintiff knowingly included false allegations in the Original Complaint because board minutes cited by the Defendants in their answer (1) were approved by the Plaintiff without mention of the alleged coercion and (2) show that the meeting at which they were appointed occurred in March, rather than August. The Plaintiff has not further contested the Defendants' proffered alternative date for the meeting, but such an inaccuracy could easily have been an oversight. More importantly, I do not perceive, and the Defendants do not argue, that the Plaintiff gained any tactical advantage from his lack of precision. I also think it unlikely that coercion of a board member, if successful, would appear in the meeting minutes. Its absence is, therefore, unremarkable. In any event, these allegations do not appear in the Operative Complaint.

---

[62] *Id.* at \*1–\*2.
[63] *Id.* at \*4.
[64] *Id.* at \*9.

The Defendants next take issue with the First Amended Complaint. Although the allegations complained of above were absent from this pleading, they were replaced by allegations relying on the July 18 Minutes which did not appear in the Initial Complaint.[65] An expert report attached to the Defendants' Opening Brief contends that, despite the July 18 Minutes being dated to 2012, their meta-data suggested they had been created no earlier than 2017.[66] The Defendants also cite the Plaintiff's deposition, in which the Plaintiff could not say whether he prepared the July 18 Minutes before, during, or after the alleged meeting.[67] The Defendants submit that these "circumstances all but conclusively establish [the July 18 Minutes] to have been fabricated by Plaintiff for purposes of misleading the Court."[68] This serious charge I am unable to evaluate on this record. As with the coercion allegations in the Initial Complaint, these allegations regarding minutes are absent from the now-Operative Complaint. As the Defendants note, this cuts both ways: the Defendants must aim at an ever-moving target.

As to the Operative Complaint, the Defendants primarily take issue with the absence of verification.[69] As discussed above, I permitted the Plaintiff to correct his defective pleading by submitting the required verification. The Defendants have not

---

[65] *See* First Am. Compl. ¶ 13.
[66] *See, e.g.*, Opening Br. 15; Opening Br., Ex. B 4–5.
[67] Opening Br. 15–16.
[68] Opening Br. 16.
[69] Opening Br. 18–19; Ltr. re Remaining Issues 3, Dkt. No. 55.

argued that the verification filed in response is invalid. Again, however, the lax method by which the Plaintiff has grudgingly obeyed our Rules is not cost free to the Defendants or, for that matter, the Court. I nonetheless treat the Operative Complaint as verified. Other than verification, the Defendants reiterate their overarching argument that the "ever-shifting" and "false and/or unreliable allegations" of the pleadings are grounds for dismissal of the Operative Complaint.[70]

Other cases applying 41(b), including *Bessenyei* and *Parfi*, on which *Bessenyei* relies, involved developed factual records that revealed either calculated tactical maneuvers, patent falsehoods, or, in one case, witness tampering.[71] In *Bessenyei*, there were three separate invalid notarizations and the Court also noted that "the requirement that the person whose signature is to be notarized personally appeared before the notary is both clear and readily accessible to anyone who undertakes any sort of effort to find out;"[72] and that the plaintiff whose signature was improperly notarized appeared to have been aware of the problem.[73] Here, the Defendants argue that the Plaintiff's allegations in previous pleadings that are no longer operative were false.

---

[70] Ltr. re Remaining Issues 3.
[71] *See Stone & Paper Invs., LLC v. Blanch*, 2019 WL 2374005, at *9–10 (Del. Ch. May 31, 2019) (collecting cases).
[72] *Bessenyei v. Vermillion, Inc.*, 2012 WL 5830214 at *8.
[73] *Id.* at *8–9.

14

If the Defendants are correct that the Plaintiff knowingly submitted falsified corporate records to this Court, that conduct would violate the oath requirement of Rule 3(aa). I am unable to make such a finding on the limited record before me, however. I note as well that the allegations the Defendants assert are false, including those referencing the purportedly falsified July 18 Minutes, are absent from the Operative Complaint and will therefore not be at issue as the litigation moves forward. Relatedly, parties are generally permitted to amend their pleadings. While there may be a lack of reliability and consistency in the Plaintiff's pleadings in general, and absent a finding of perjury unavailable on this record, I do not conclude that the two amendments in this case so clearly demonstrate misconduct or tactical maneuvering that dismissal is compelled.

The Defendants' remaining argument for dismissal is based on the Plaintiff's repeated failure to meet court-ordered deadlines, as outlined above. This is, I note a summary matter; a statutory cheetah proceeding at a pace that would not tax a sloth. If well prosecuted, it could and should have been resolved expeditiously. But I am not convinced that the harshest of sanctions is warranted; the Plaintiff here is without counsel and has also made efforts to correct his procedural mistakes. In the letter accompanying the verification to the Operative Complaint, the Plaintiff apologized for his failure to verify the amended pleading, which was submitted as his then-

15

Counsel was in the process of withdrawing representation.[74] He also apologized for his tardiness in opposing the Motion to Dismiss over a year prior, which he contends was due to him not being aware of the deadline.[75]

It is not, to my mind, obvious that the Plaintiff has attempted to manipulate this Court to secure a tactical advantage[76] or otherwise "undercut[] the integrity of the judicial process."[77] And whatever his intent, I do not discern that the Defendants have suffered the kind of harm that warrants dismissal. Accordingly, I decline to dismiss on these grounds. I do so, however, without prejudice to the Defendants' right to renew the motion in the event the Plaintiff fails to prosecute or an appropriate evidentiary proceeding reveals that the Plaintiff falsified documents or otherwise engaged in severe misconduct to achieve an advantage in this litigation.

*B. The Status Quo Order*

The Defendants have also asked that I lift the Status Quo Order, which prevents the Company from taking any "material action out of the ordinary course of business," without prior notice to the Plaintiff and to the Court.[78]

---

[74] *See* Ltr. Response to Ltr. Op. 1, Dkt. No. 61.
[75] *See id.*
[76] Especially considering that, since becoming *pro se*, the Plaintiff appears to have never filed a motion or served a discovery request.
[77] *Bessenyei v. Vermillion, Inc.*, 2012 WL 5830214 at *8.
[78] Status Quo Order ¶ 2, Dkt. No 14.

"Once [a] status quo order is in place, the party seeking modification bears the burden of showing why it should be modified."[79] "In deciding whether to modify or vacate a status quo order, it is proper for the court to assess whether the facts or circumstances justifying the initial restraint have changed."[80] In particular, I must here evaluate whether the balance of the equities has changed due to the dilatory and procedurally deficient actions of the Plaintiff.

This is a two-and-a-half-year-old summary proceeding involving a nine-year-old stock purchase agreement. The Status Quo Order was granted early in the litigation, in the interest of preserving the Court's ability to summarily and promptly resolve the questions of stock ownership and the proper composition of the Company's board of directors. That intent has proved naive. Although I decline to revisit my finding that the Plaintiff has adequately alleged irreparable harm if he prevails on his claim that his removal from the board was *ultra vires*, two-odd years later, the balance of the equities may well be different. The Defendants contend that the Status Quo Order "has created a cloud over the effective and efficient operation of the Company."[81] Nonetheless, because I mean to move this matter forward with alacrity, and because, frankly, the Defendants' rationale for lifting the order is based

[79] *R&R Capital LLC v. Merritt*, 2013 WL 1008593, at *8 (Del. Ch. Mar. 13, 2013) (citing *Conn. Gen. Life Ins. Co. v. Pinkas*, 2010 WL 4925832, at *2 (Del. Ch. Nov. 18, 2010)).
[80] *Germaninvestments AG v. Allomet Corp.*, 2019 WL 2236844, at *10 (Del. Ch. May 23, 2019), *aff'd in part, rev'd in part on other grounds and remanded*, 225 A.3d 316 (Del. 2020).
[81] Ltr. re Pending Mot., Dkt. No. 43.

on the passage of time rather than concrete hardship, I will leave the status quo order in place. Again, this is without prejudice to any party's motion, should circumstances change.

### III. CONCLUSION

The Defendants Motion to Dismiss the Second Amended Complaint is denied without prejudice. My decision here should not be read to convey satisfaction with the pace or trajectory of this litigation. The Plaintiff must comply with Court rules going forward. The parties should submit suggested orders governing the preparation of this matter for trial or case dispositive motions, consistent with its summary nature, by June 15; I will impose an Order, including a trial date, thereafter.

An appropriate Order implementing this Memorandum Opinion is attached.

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

JONATHAN GOVETTE,                    )
                                     )
                Plaintiff,           )
                                     )
        v.                           )  C.A. No. 2019-0139-SG
                                     )
ELECTRONIC REFERRAL                  )
MANAGER, INC., DAVID                 )
BONGIOVANI, RICK HAMMER, AND  )
JOSEPH MACALUSO,                     )
                                     )
                Defendants.          )

## **ORDER**

For the reasons stated in the accompanying Memorandum Opinion, IT IS

HEREBY ORDERED, this 7th day of June, 2021

1.  The Motion to Dismiss is DENIED.

IT IS SO ORDERED.


                                    /s/ Sam Glasscock III

                                    Vice Chancellor